## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CAROL M. GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08CV1373 |
| v. | ) | Judge Gottschall |
| | ) | |
| ILENE LARSON, JEANNE SHILTS, | ) | |
| and GL REHABILITATION | ) | |
| SERVICES, LTD., an Illinois | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

---

## ANSWER

---

NOW COME the Defendants, Ilene Larson, Jeanne Shilts, and GL Rehabilitations Services, Ltd., by their attorneys, Stroud, Willink, and Howard, LLC, and for their Answer state as follows:

1. This action seeks a declaration that no money is owed by Plaintiff to Defendants pursuant to a certain Stock Purchase Agreement, whereby Plaintiff sold all of her ownership of GL Rehabilitation Services, Ltd., an Illinois corporation, to the individual Defendants.

**ANSWER**:  The Complaint speaks for itself.  Although Plaintiff seeks a judicial determination, Defendants deny that Plaintiff owes no money to Defendants pursuant to the Stock Purchase Agreement ("Agreement").

2. This action also seeks damages for breach of express warranties by the Defendants, breach of the Defendants' fiduciary duties as employees of the company prior to closing, and fraud, along with rescission of a purported Release fraudulently obtained by the Defendants at the Closing of the stock sale.

1

**ANSWER**:  The Complaint speaks for itself.  Defendants deny that Defendants breached any

fiduciary duties or committed fraud, and deny that Plaintiff is entitled to any damages.  Defendants

also deny that Plaintiff is entitled to rescission of the referenced Release.

3. The Plaintiff, CAROL M. GORDON ("Plaintiff" or "Gordon"), resides at 2336 N.

Commonwealth, Chicago, Illinois, in Cook County.

**ANSWER**:  Defendants admit that the address for Plaintiff is listed as set forth in Paragraph 3, but

Defendants lack knowledge as to whether this address is Plaintiff's current residence.

4. Defendants ILENE LARSON ("Larson") and JEANNE SHILTS ("Shilts") are, and have

been at all relevant times, residents of the State of Wisconsin.  Larson and Shilts are hereinafter

referred to as "the Defendants."

**ANSWER**:  Defendants admit the allegations contained in Paragraph 4.

5. GL Rehabilitation Services, Ltd. ("GL Rehabilitation" or "the Corporation") is a domestic

corporation duly organized under the laws of the State of Illinois, with its registered offices, at the

time of its sale to Defendants, located at 79 West Washington Street, Suite 1119, Chicago, Illinois, in

Cook County.

**ANSWER**:  Defendants admit that GL Rehabilitation Services, Ltd. (the "Corporation") is an

Illinois corporation and that the registered office address for GL Rehabilitation Services, Ltd. is

listed as set forth in Paragraph 5, but lack knowledge as to whether this address was listed as the

registered offices at the time of the Corporation's sale to Defendants.  Defendants allege that the

Corporation's sole place of business is in the state of Wisconsin and that its address is 2620

Waunona Way, Madison, Wisconsin 53713.

6. Gordon, as the sole shareholder and director of GL Rehabilitation, entered into a Stock

Purchase Agreement ("the Agreement") with Defendants, effective as of December 31, 2007,

2

whereby Gordon agreed to sell 100% of the issued and outstanding stock of GL Rehabilitation to

Defendants.

**ANSWER:**  Defendants admit the allegations contained in Paragraph 6.

7. A copy of the Agreement, signed by all parties, is attached hereto as Exhibit "A."

**ANSWER:**  Defendants admit that a signed copy of the Agreement is attached to the Complaint,

but allege that the copy of the Agreement is missing Exhibit 1, the Corporation's Balance Sheet as of

September 30, 2007.

8. Defendants were at the time of the sale, and continue to be, employees of GL

Rehabilitation.

**ANSWER:**  Defendants admit the allegations contained in Paragraph 8, and assert that Defendants

Larson and Shilts are now, since the closing of the stock sale pursuant to the Agreement (the

"Closing"), the sole shareholders in the Corporation.

9. Defendant Larson was also, at the time the Agreement was entered into, the Secretary of GL

Rehabilitation.

**ANSWER:**  Defendants admit that Defendant Larson was the Secretary of GL Rehabilitation at the

time of the sale, and further allege that Larson was the Rehabilitation Agency Administrator.

10.  The Agreement was negotiated in substantial part in Illinois, was executed in Illinois by the

Plaintiff, and was performed in substantial part by the Plaintiff in Illinois.

**ANSWER**:    Defendants deny that the Agreement was negotiated and performed in substantial part

in Illinois.  Defendants deny that Plaintiff has performed the Agreement, except for the transfer of

her shares of stock.  The Agreement was initially executed by Plaintiff in Illinois and faxed to

Defendants Larson and Shilts in Wisconsin, where they signed it and faxed it back to Plaintiff.   The

Agreement was subsequently re-signed by the parties at Closing when they met in person in Illinois.

11.   The Agreement, in Section 19 on page 7 thereof, states, in part, that the Agreement "is being delivered in the State of Illinois and is intended to be performed in the State of Illinois…"

**ANSWER**:  Defendants admit the allegations contained in Paragraph 11.

12.  The Agreement also sates, in Section 19, that it is to be "construed and enforced in accordance with the laws of the State of Illinois."

**ANSWER:**  Defendants admit the allegations contained in Paragraph 12.

13.   The Closing of the sale under the Agreement occurred at Mt. Prospect National Bank, 50 N. Main Street, Mount Prospect, Illinois, in Cook County.

**ANSWER:**  Defendants admit the allegations contained in Paragraph 13.

14.   Venue in this Court is proper under 735 ILCS 5/2-101.

**ANSWER:**  Defendants deny that the proper venue is Cook County Circuit Court, as Defendants have filed a Notice of Removal with this Court.

## PLAINTIFF'S COUNT I – DECLARATORY JUDGMENT

15.   Paragraphs 1 thru 14, above, are incorporated herein by this reference.

**ANSWER:**  Defendants restate their answers to Paragraphs 1 through 14 as though fully set forth herein.

16.   The Agreement (Exhibit A) contains various terms which allocate, between the parties, responsibility for various expenses and liabilities, and identify certain assets which the Plaintiff was to retain at and after the Closing of the sale.

**ANSWER:**  Defendants admit the allegations contained in Paragraph 16, but allege that the Agreement speaks for itself.

17.   The parties' respective promises under the Agreement comprised their mutual consideration for entering into the Agreement.

4

**ANSWER:** Defendants admit the allegations contained in Paragraph 17 and further allege that Defendants paid additional consideration to Plaintiff in the form of $100,001.00 in cash.

18.   Almost immediately after the Closing, the parties began to disagree as to whether each of them had complied with its duties, or deprived the other party of its rights, under the Agreement.

**ANSWER:** Defendants admit the allegations contained in Paragraph 18.

19.   For example, Section 4(c) of the Agreement provided that Plaintiff would retain the cash in the company's bank accounts, net of checks issued prior to Closing, while Section 6 called for the Plaintiff to pay certain expenses of the Corporation incurred prior to the Closing.

**ANSWER**: Defendants admit that Section 4(c) of the Agreement provided that Plaintiff would retain the cash, if any, in the Corporation's bank accounts, net of checks issued prior to Closing. Defendants further admit that Section 6 required for the Plaintiff to pay certain expenses of the Corporation incurred or arising prior to closing, and allege that Plaintiff failed to comply with Section 6.  Defendants also allege that Plaintiff failed to comply with Section 4(c) and Section 8 in that Plaintiff wrote checks on the Corporation's bank account when there were insufficient funds in the Corporation's account, and wrote checks out of the Corporation's account after January 1, 2008.

20. Defendant Larson, as manager, prior to Closing, of the Corporation's office where the Defendants worked, was issued an American Express Credit Card on the personal account of the Plaintiff, under instructions that she was only to use the card for legitimate business purposes of the Corporation.

**ANSWER**: Defendants admit the allegations contained in Paragraph 20.

21. In addition, Larson was given authority to instruct the Corporation's payroll service, ADP, on the amounts of pay to issue to the Corporation's employees each pay period.

**ANSWER**: Defendants admit the allegations contained in Paragraph 21.

22. ADP, acting on Larson's instructions, would then issue checks to the Corporation's employees, drawn against the Corporation's bank account.

**ANSWER**: Defendants admit the allegations contained in Paragraph 22.

23. After the Closing, Plaintiff discovered that Larson had depleted the company's bank accounts by instructing ADP to pay employee "bonuses" of more than $10,000.00 the last week in December before the Closing.

**ANSWER**:  Defendants deny that Plaintiff discovered the employee holiday bonuses after the Closing.  Defendants assert that Plaintiff knew prior to the Closing that GL Rehabilitation issued holiday bonuses to its employees every year in December in the ordinary course of business and that they would be paid in 2007.  Copies of the payroll records showing the employee bonuses paid in the years 2004, 2005, 2006, and 2007 are attached hereto as Exhibit A.  Plaintiff participated in a telephone call with Larson and Shilts in early December 2007 during which employee bonuses for 2007 were discussed and she never prohibited their payment.  The total amount of bonuses issued in 2007 was $10,500.00.  Plaintiff had agreed, in Section 11 on page 5 of the Agreement, to operate the business of the Corporation in substantially the same manner and to make no material changes.

24. Presumably, the bulk of the so-called bonuses went to the two Defendants.

**ANSWER**:  Defendants deny the allegations in Paragraph 24 and assert that Ilene Larson received no bonus in 2007, and that Jeanne Shilts received a bonus of $2,000.00.

25.   The bonuses were paid without authorization from the Plaintiff as President and sole shareholder of the company.

**ANSWER**:  Defendants deny the allegations in Paragraph 25, and re-assert that Plaintiff participated in a telephone call with Larson and Shilts in early December 2007 during which 2007 employee bonuses were discussed.  Additionally, there was no policy in place by which Ilene Larson

needed approval to pay out holiday bonuses to employees.  Moreover, Plaintiff had agreed, in Section 11 on page 5 of the Agreement, to operate the business of the Corporation in substantially the same manner and to make no material changes.

26.   In fact, prior to their issuance, Plaintiff had expressly instructed Defendant Larson not to pay bonuses for the year, due to the Corporation's weak finances.

**ANSWER**:  Defendants deny the allegations in Paragraph 26.  Defendants assert that GL Rehabilitation collected over $101,000 in revenue in December 2007.  Defendants further assert that any apparent "weak finances" were a result of Plaintiff's withdrawals from GL Rehabilitation's bank account in violation of Sections 4(c) and 8 of the Agreement.  Defendants further allege that Plaintiff's refusal or neglect to pay the employees a holiday bonus would have been a violation of Section 11 of the Agreement.

27.   The purported bonus payments were not disclosed to Plaintiff prior to the Closing, and were unknown to her as of that time.

**ANSWER**:  Defendants deny the allegations in Paragraph 27 and restate herein their answer to Paragraph 23.

28.   The effect of the so-called bonus payments was to deplete the cash which Plaintiff was entitled to receive under Section 4(c) of the Agreement, and/or resulted in a shortfall of cash in the Corporation's bank accounts with which to cover checks previously issued for different, legitimate purposes.

**ANSWER**:  Defendants deny the allegations in Paragraph 28 and assert that the purpose of the holiday bonuses was to reward GL Rehabilitation's hardworking and dedicated employees for their work, as had been done in prior years in the ordinary course of business.  Defendants further assert that Plaintiff was not entitled under the Agreement to receive the money that was earmarked for

bonuses because Plaintiff agreed in Section 11 of that Agreement to use all reasonable efforts to

carry on business in substantially the same manner as before the date of the Agreement, and to

"make no material changes to the Business, management, accounting, tax reporting or operation."

Defendants assert that Plaintiff never provided Defendants Larson and Shilts with any information

regarding the status of the Corporation's bank account prior to Closing, despite Plaintiff's obligation

to make such information available to Defendants pursuant to Section 11 of the Agreement.

29.  In addition, after the Closing, Defendants demanded that Plaintiff pay $7,756.24 in alleged

employee mileage expenses.

**ANSWER:**  Defendants deny that the demand referenced in Paragraph 29 was made after the

Closing.  Defendants assert that Plaintiff was aware of all mileage statements before closing and, at

the Closing, handed a disorganized box full of mileage statements to Defendant Larson before

leaving abruptly for Colorado to go skiing.

30.  This included more than $6,000.00 in such expenses for Defendant Shilts and Defendant

Larson's live-in companion, Mark Schuster, covering a 2-year period.

**ANSWER:**  Defendants admit the existence of such mileage expenses and assert that, when GL

Rehabilitation was formed in the Spring of 2003, Plaintiff promised Larson, Shilts, and Schuster that

they would be reimbursed for mileage when the company "got on its feet."  Defendants assert that

Plaintiff continued to make that promise several times over the course of four years.  In September

2007, Larson, Shilts, and Schuster brought their mileage statements to a meeting with Plaintiff at the

Elmhurst Clinic.  Plaintiff stated at that meeting that she would settle up the mileage statements

when the Corporation changed hands.

31.  Defendants had never previously disclosed to Plaintiff the existence of these supposed

mileage claims.

8

**ANSWER:** Defendants deny the allegations in Paragraph 31 and restate herein their answer to Paragraph 30.

32.  In Section 14 of the Agreement, the Defendants represented and warranted "that they have no knowledge of claims which exist or are threatened against the Corporation, that they have made no material changes to, or suffered or incurred any liability with respect to the Business, or the Corporation except as provided herein…"

**ANSWER**:  Defendants admit the allegations contained in Paragraph 32, but deny any inference that Defendants breached Section 14 of the Agreement.

33.  The Defendants breached the warranties of Section 14 by creating undisclosed and improper claims with respect to the business, in the sum of at least $10,000.00 due to the undisclosed payment of the bonuses, and in the sum of at least $7,756.24 by reason of the undisclosed mileage claims.

**ANSWER**:   Defendants deny the allegations contained in Paragraph 33 and restate herein their answers to Paragraphs 23 through 31.

34.  In addition, at the time the bonuses were paid, the Defendants, as employees of the Corporation, owed a fiduciary duty of loyalty to the Corporation, and to the Plaintiff as its sole owner, not to spend money contrary to her instructions, and to inform the Plaintiff in a timely fashion of expenditures made.

**ANSWER**:  Defendants admit that they had a fiduciary duty of loyalty to the Corporation, and assert that Plaintiff also had a fiduciary duty to the Corporation.  Defendants deny that they spent money contrary to Plaintiff's instructions, that they failed to inform Plaintiff of any expenditure which Defendants were required to disclose, or that they breached any fiduciary duty.

35.  The Defendants breached their fiduciary duties by paying the aforesaid bonuses in contravention of Plaintiff's instructions, and by failing to inform the Plaintiff of the bonus payments and mileage claims before the Agreement was signed and before the sale which it contemplated was closed.

**ANSWER**:  Defendants deny that they breached any fiduciary duties with respect to the holiday bonuses and mileage claims, and deny that they failed to inform Plaintiff of said bonuses and mileage claims.  Defendants allege that Plaintiff explicitly agreed, in Sections 6 and 11 of the Agreement, to pay and cause to be paid the Corporation's expenses incurred or arising before Closing and to make no material changes in the Corporation's operations.

36.   In addition, the Defendants' representation in Section 14 of the Agreement was made by them with knowledge of its falsehood, for the purpose of inducing the Plaintiff to sign the Agreement and potentially be obligated to pick up the tab for the bonuses and mileage claims.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 36.

37.  The failure of Defendants to disclose the bonuses and mileage claims before the Plaintiff executed the Agreement was an omission of material facts which were necessary to render accurate the express statement of Section 14.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 37 and assert that Plaintiff failed to disclose material facts in violation of Section 14 of the Agreement.  The facts alleged were known to Plaintiff prior to the Closing.

38.   Plaintiff reasonably relied upon the Defendants' statements in Section 14, and their omissions with respect to the bonuses and mileage claims, by executing the Agreement, closing the sale, and signing at Closing a so-called "Release," attached as Exhibit "B."

**ANSWER**: Defendants deny that there were any omissions on their part and, accordingly, deny that Plaintiff relied upon any omissions in executing the Agreement and Release.

39.   Even in the absence of express misrepresentations or breach of fiduciary duty, the withholding of information by the Defendants as to bonuses and mileage claims, which the Defendants now demand that the Plaintiff pay but which only the Defendants would have known about, comprised a constructive fraud justifying rescission of the Release, as well as damages.

**ANSWER**: Defendants deny that they withheld any information as to bonuses and mileage claims, or any other material fact.  Defendants further deny the allegation of constructive fraud and deny that Plaintiff is entitled to rescission of the Release or to damages.

40.   Section 15 of the Agreement provides that provisions, warranties and representations therein survived Closing; consequently, the Release cannot be interpreted so as to release claims under the Agreement in any event.

**ANSWER**: Defendants admit that Section 15 states that provisions, warranties and representations survive closing, but deny any breach of such provisions, warranties and representations and, therefore, assert that the Release is valid.

41.   The Plaintiff has performed and satisfied all conditions on her part which are required in order to entitle her to full performance of the Agreement by the Defendants.

**ANSWER**: Defendants deny the allegations contained in Paragraph 41, and allege that Plaintiff failed to perform her obligations under the Agreement when she wrote checks out of the Corporation's bank account when the account was overdrawn; when she failed to disclose material information to Defendants prior to Closing regarding the Corporation's accounts; when she failed to disclose to Defendants two liens against the Corporation—one against the Corporation's $100,000 line of credit with Midwest Bank and another, lien number 010099404 filed by VGM Financial

Services, against equipment leased by the Corporation (collectively, the "Liens"); and when she failed to pay overdue payroll taxes and liabilities in violation of Section 6 of the Agreement.

42.  If Plaintiff is deemed responsible for any bank shortfall as of the date of Closing or for mileage claims, then she has been injured as a direct and proximate result of the Defendants' breach of warranty, breach of fiduciary duty, fraudulent misrepresentations, and constructive fraud inherent in the unauthorized bonuses and undisclosed mileage claims – a sum of at least $17,756.24.

**ANSWER**:  Defendants deny any allegation of breach of warranty, breach of fiduciary duty, fraudulent misrepresentation, or constructive fraud, and deny that they have caused Plaintiff any injury.

43.  Plaintiff faxed to Defendant Larson, on January 12, 2008, the memo attached hereto as Exhibit "C," objecting to the so-called bonus payments.

**ANSWER**:  Defendant Larson admits that she received the fax referenced in Paragraph 43, and asserts that Plaintiff's fax was sent two weeks after bonuses had already been paid.  Defendant alleges that Plaintiff knew year-end holiday bonuses had been paid to the Corporation's employees in the ordinary course of business every year since the Corporation's inception, and that Plaintiff knew Defendants planned to pay bonuses again in 2007 and that she never directed otherwise, which would have constituted a violation of Section 11 of the Agreement.

44.  The Plaintiff also denied liability for the alleged mileage claims, by returning to the Defendants the alleged "Mileage Expense Report" for Shilts' and Schuster's mileage claims, which were sent to Plaintiff in early January 2008, with notations from Plaintiff denying responsibility.  See Exhibits "D" and "E," attached.

**ANSWER**:  Defendants admit that they sent the mileage reports to Plaintiff, and allege that they did so only after Plaintiff requested that Defendants send the mileage reports so that Plaintiff could "settle" up with Shilts and Schuster.

45.  Defendants responded with a letter from their attorney on January 28, 2008, claiming that Plaintiff owes $169,575.70 (copy attached as Exhibit "F"), and demanding immediate payment thereof.

**ANSWER**:  Defendants admit the allegations contained in Paragraph 45 and maintain the position set forth in the referenced letter.

46.  Plaintiff denies responsibility for virtually all of the sums claimed by Defendants in their attorney's letter (including the bank account shortfall arising from the unauthorized bonuses described above, and the purported mileage expenses which went unreported for 2 years until after the Closing).

**ANSWER**:  Defendants deny that the bank account shortfall resulted from the payment of employee holiday bonuses, and allege that the shortfall resulted from Plaintiff's overspending the account in breach of the Agreement.  Defendants further deny that the mileage expenses were never reported to Plaintiff prior to Closing.

47.  An actual and justiciable controversy exists among the parties as to the following sums claimed by the Defendants (reference being made to portions of their attorney's spreadsheet).

a.    Section 1:  $11,826.19 in alleged "Wages" from December 22-28, 2007.  This includes at least $10,000.00 in bonuses paid to Defendants, which Plaintiff explicitly instructed Defendants not to pay, as stated above.  Therefore, at least $10,000.00 of this amount is not owed by Plaintiff, or at least is subject to a setoff.

**ANSWER:** Plaintiff expressly assumed responsibility for payment of these wages in Section 6 on page 3 of the Agreement. Defendants deny responsibility for $11,826.19 in wages, and deny that the holiday bonus payments are includable in the pay period from December 22-28; rather, Defendants assert that the bonuses were included in the previous pay period. See Exhibit A.

    b.    Section 1: $1,483.72 in alleged "Federal Withholding" from December 22-28, 2007. Under Section 5(a) of the Agreement, these expenses are allocated to the Buyers (i.e., the Defendants), and therefore are not owed by Plaintiff.

**ANSWER**: Defendants deny responsibility for the $1,483.72 referenced in Paragraph 47b and assert that Plaintiff is responsible for that sum. Defendants Larson and Shilts admit that Section 5(a) of the Agreement obligated them, as Buyers, to pay FICA, FUTA, and SUTA taxes, but allege that the Agreement did not obligate Buyers to pay federal and state withholding, which remained the obligation of Plaintiff.

    c.    Section 1: $683.76 in "State Withholding" from December 22-28, 2007. Under Section 5(a) of the Agreement, these expenses are allocated to the Buyers, and therefore not owed by Plaintiff.

**ANSWER**: Defendants deny that they are responsible for $683.76 in state withholding under Section 5(a) of the Agreement, and assert that Plaintiff is responsible for that sum.

    d.    Section 2: $11,937.75 for "Midwest Overdraft Amount." Virtually all of this amount is the result of the unauthorized bonuses discussed above, and to that extent is not the responsibility of Plaintiff. In addition, the balance of the shortfall represents at least $1,250.00 in payments for patient services which, on information and belief, were made in 2007 but not sent by the Defendants to Plaintiff for deposit to the Corporation's accounts at that time; instead those sums were re-billed after Closing, and presumably deposited thereafter in accounts belonging to the

14

Defendants, in an apparent deliberate effort to deprive Plaintiff of the benefit of cash. In addition, Plaintiff is entitled to setoffs as described in sub-paragraph f, below.

**ANSWER**: Defendants deny that the $11,937.75 referenced in Paragraph 47d was not the Plaintiff's responsibility, and deny that the overdraft was caused by unauthorized bonuses. Defendants assert that the overdraft was caused by Plaintiff's withdrawals from the account, which she failed to disclose to Defendants, and which left insufficient funds to cover the payroll for December 28, 2007. Regarding the $1,250.00 in payments for patient services referenced in Paragraph 47d, Defendants deny that the re-billing of those sums was done to deprive Plaintiff of the benefit of that cash. Instead, Defendants allege that the Corporation's practice was to send checks to Plaintiff in Bensenville, Illinois for deposit. Defendants assert that Plaintiff did not have any uniform policy in place as to the manner in which to send checks. The billing company, ProvidrServ, asked Defendants about certain checks that were missing in 2007. The missing checks were from a time period during which Larson was absent, caring for her ill father. Shilts was able to find some of the missing checks, which were sent to Plaintiff, and Larson asked ProvidrServ to reissue the rest. It cost GL Rehabilitation, post-Closing, $800.00 to have the checks re-issued. Defendants deny that Plaintiff is entitled to any setoff.

　　　e.　　Section 2:  Alleged Additional "Midwest Overdraft Amount."  Amounts of $6,020.20, $9,321.00, $26.81, $67.01, $1,386.99, and $1,290.00, if withdrawn, were properly available to Plaintiff, and might comprise "overdrafts" only as a result of the improper bonus payments referenced above, failure to deposit company revenues in 2007 as referenced above, and/or January 2008 expenses which are the responsibility of Defendants as the Buyers, pursuant to Section 9 of the Agreement.

15

**ANSWER**:  Defendants deny liability for the amounts referenced in Paragraph 47e, and allege that any overdraft was a result of Plaintiff's improper withdrawal of funds from the Corporation's bank account in violation of Sections 4(c) and 6 of the Agreement.  Defendants further deny that they failed to pay any expenses which were their responsibility under Section 9 of the Agreement.

   f. <u>Section 2:  Various amounts under alleged "Withdrawal (spent) from Midwest Account of January deposits" totaling $12,391.43</u>.  Plaintiff has not been provided backup of these amounts showing that they are for authorized expenses of GL Rehabilitation incurred prior to January 1, 2008.  In addition, any amounts owed are subject to a setoff by reason of unauthorized charges made by Larson against the American Express Credit Card account of Plaintiff and not disclosed prior to Closing, including but not limited to: (i) at least $1,250.00 charged after the Closing; (ii) over $1,500.00 charged in December 2007 and January 2008 for rental of a personal car at Enterprise by Defendant Shilts; (iii) at least $1,200.00 for personal purchases at Barnes & Noble and Amazon in December 2007; (iv) $267.00 for dinner at Morton's in Chicago; (v) at least $1,677.00 in supply purchases which Defendant deliberately and surreptitiously accelerated during the period when the Agreement was being negotiated, in a bad faith effort to make those an unforeseen expense to the Plaintiff benefiting only the Defendants after closing (at Econoprint, U.S. Postal Service, and Staples, among other places); (vi) $895.00 paid to APTA (a professional organization) in December.

**ANSWER**:  Defendants deny that they needed authorization for the expenses referenced in Paragraph 47f, and allege that such purchases were made in the ordinary course of business, and were consistent with expenses paid in previous years.  Defendants deny that Plaintiff is entitled to any setoff.  Plaintiffs deny that the charges references in items (i)-(vi) were unauthorized.

Defendants deny that the charges listed in item (i) were improper or unauthorized.  Item (i) refers to charges shown on the January American Express bill subsequent to Closing.  Defendants admit that that the following charges made for business expenses subsequent to Closing are the responsibility of Defendants: a charge for $51.14 to Amazon.com dated 1/08/08, a charge for 328.00 to USPS dated 1/08/08, a charge for $203.58 to Staples dated 01/08/08, and a charge for $11.95 to Yahoo dated 1/18/08.  Defendants assert that they have not yet reimbursed Plaintiff for these small sums because Plaintiff continues to owe Defendants over $171,000.00 pursuant to the Agreement.  A copy of the January American Express bill, with Larson's notations, is attached hereto as <u>Exhibit B</u>.

Defendants assert that item (ii) refers to car rental expenses incurred by Shilts in December 2007 while her car was being repaired, after Shilts was in a car accident while working for the Corporation.  Both Larson and Shilts spoke with Plaintiff on the phone about renting a car so that Shilts could continue working while her car was being repaired.  Plaintiff approved the request for a car rental, and indicated that she hoped a workers' compensation claim would not be filed by Shilts.

Defendants deny that the purchases described in item (iii) were personal, and assert that such charges were for books and for $10 and $15 gift cards, which were given as Christmas gifts to the Corporation's clients and per diem employees.  This practice of year-end holiday gift-giving is consistent with gift-giving practices of previous years, as is evidenced by the receipts attached hereto as <u>Exhibit C</u>.

Defendants assert that item (iv) that the charge for $267.00 at Morton's was for an employee dinner, and was consistent with practices in previous years.  Receipts and expense requests for similar meals from prior years are attached hereto as <u>Exhibit D</u>.

17

Defendants assert that the amount in item (v), referencing payments to Econoprint, Staples, FedEx, and the U.S. Postal Service, was for shipping costs and supplies for the clinic, which are ordered from time to time as the clinic needs them, and are business expenses for which Larson did not need authorization.

Defendants assert that item (vi) was a proper charge for Larson's annual APTA dues and for a book and CD needed by the clinic.  Defendants assert that these were business expenses for which no authorization was required.

      g.    <u>Section 3:  $84.37 and $87.17 for ADP</u>.  These amounts have been paid by Plaintiff.

**ANSWER**:  Defendants admit that the referenced amounts were paid by Plaintiff, but assert that Plaintiff paid with overdraft checks.

      h.    <u>Section 4:  $613.81 for Dell</u>.  This is a lease for a computer incurred on a monthly forward-looking basis as the computer is used, and is the responsibility of the Defendants beginning with the January 2008 payment.

**ANSWER**:  Defendants deny that they own or are in possession of the referenced computer.

      i.    <u>Section 5:  $613.81</u>.  This amount has been paid.

**ANSWER**:  Defendants allege that this amount appears to be a duplicate of the Dell charge referenced in Paragraph 47h.

      j.    <u>Section 6:  Alleged Mileage charges of $4,564.92 and $1,584.00 for Jeanne Shilts and Mark Schuster</u>.  As discussed above, these amounts were never submitted during the last two years, and Defendant just submitted block requests for payment after the sale closed.  $62.00 for license renewal of Melissa Monte was not an obligation of GL Rehabilitation, and is therefore not due from Plaintiff.  The remaining amounts have been or will be paid by Plaintiff.

**ANSWER**:  Defendants deny that the referenced mileage claims were never submitted, and allege that the "block requests" were sent to Plaintiff upon her request.  Defendants deny that Plaintiff is not responsible for the license renewal of Melissa Monte, as license renewals have been paid by GL Rehabilitation in the past pursuant to the Corporation's benefit policy.

  k. <u>Section 7:  Alleged Evansville Review for $276.31</u>.  This is for a 2008 directory and not the responsibility of Plaintiff.

**ANSWER**:  Defendants deny that the referenced charge is for a 2008 directory and deny that Plaintiff is not responsible for such charge.  Defendants assert that the charge is for ads that ran in the local newspaper in October and November 2007 and, therefore, the charge is Plaintiff's responsibility.

  l. <u>Section 10:  FedEx Charges</u>.  $22.93 has been paid by Plaintiff.

**ANSWER:**  Defendants deny that Plaintiff has paid the outstanding FedEx charges for which she is responsible, and allege that Plaintiff still owes them $33.93 for 2007 FedEx services.

  m. <u>Section 12:  Health EOS</u>.  $50.00 has been paid by Plaintiff.

**ANSWER**:  Defendants admit that Plaintiff made the $50.00 payment, but assert that the payment was for November.  Defendants assert that Plaintiff is still responsible to pay December Health EOS charges.

  n. <u>Section 13:  Lifetech</u>.  Total charges of $942.28 have been paid by Plaintiff.

**ANSWER**:  Defendants admit that Plaintiff made a payment of $943.28 to Lifetech, but assert that the payment was for previous, past-due billing periods, and that she is still responsible for outstanding amounts of $325.66, $169.35, and $206.77, which are bills attributable to December.

  o. <u>Section 15:  Alleged New Publishing</u>.  No backup for $157.02 has been provided to Plaintiff.

**ANSWER**:  Defendants deny that Plaintiff did not receive "backup" of the invoices referenced in Paragraph 47o, and allege that multiple notices were sent to Plaintiff by News Publishing, but Plaintiff failed to pay the invoices.  The invoices were sent to a collection agency by News Publishing, and were eventually paid on the American Express card by Defendants to satisfy the debt incurred by Plaintiff.

p.      Section 16:  Provider Serve.  $3,312.02 has been paid by Plaintiff.

**ANSWER**:  Defendants admit that Plaintiff paid $3312.02, but allege, based upon information from ProvidrServ, that this amount was for November Services.  Defendants allege that Plaintiff has not yet paid the December bill, in the amount of $4001.67, for which she is responsible.

q.      Section 18:  Stroud & Associates.  The amount of $443.75 claimed is for services by the Defendants' law firm, presumably for services to the Defendants rather than the Corporation, and Plaintiff is not responsible for Defendant's fees incurred in relation to the sale pursuant to Paragraph 16 of the Agreement.

**ANSWER**:  Defendants deny that the $443.75 claimed is for services to Defendants, and assert that Plaintiff is responsible for this amount because it is an obligation incurred by the Corporation for legal services in July 2007 related to patient consent forms.  Defendants deny that the legal fees were related to the sale of the Corporation.

r.      Section 19:  TDS Accounts.  GL Rehabilitation had a credit with this company through December 2007; therefore, the total amount claimed of $412.93 was incurred in 2008 and is not due from Plaintiff.

**ANSWER**:  Defendants deny that GL Rehabilitation had a credit with TDS, and assert that the $412.93 was incurred in 2007 and therefore is the obligation of Plaintiff.

20

s.    <u>Section 20:  Verizon</u>.  Plaintiff paid the $70.73 portion of the total bill which was due from her.  The $105.89 now claimed was incurred after Closing and is not the responsibility of Plaintiff.

**ANSWER**:  Defendants admit that Plaintiff sent payment of $70.73, in the form of check number 8669.  Defendant Larson paid $62.38 for GL Rehabilitation's portion of the bill.  Plaintiff continues to owe $35.16.

t.    <u>Section 21:  Quill</u>.  $302.32 paid by Plaintiff.  $270.22 remaining of $572.54 total was incurred after Closing and is not Plaintiff's responsibility.

**ANSWER**:  Defendants deny that Plaintiff paid the amounts referenced in Paragraph 47t, deny that Defendants are responsible for $270.22, and put Plaintiff to her proof.

u.    <u>Section 24:  Wolfpac</u>.  $100.00 was paid by Plaintiff.

**ANSWER**:  Defendants deny that Plaintiff paid the amount referenced in Paragraph 47u, and put Plaintiff to her proof.

v.    <u>Section 25:  Capital Plumbing</u>.  $147.17 was paid by Plaintiff.

**ANSWER**:  Defendants deny that Plaintiff paid the amount referenced in Paragraph 47v, and put Plaintiff to her proof.

w.    <u>Section 26:  Anthem Dental</u>.  $371.82 is for coverage after the Closing date and Buyer's responsibility.

**ANSWER**:  Defendants deny that the $371.82 is their responsibility, and allege that the bill is for December coverage, and therefore the responsibility of Plaintiff.

x.    <u>Section 27:  Alleged $13,885.41 for Second Quarter 2007 FICA, federal and state employment tax, and state and federal withholdings</u>.  Defendants do not break out these amounts, so it is unclear which portion is attributable to items other than withholding tax.  Plaintiff has

21

contacted the IRS for correction of an error by the IRS in failing to credit the Corporation for

previous payments.  No amount is owed pursuant to the Agreement until the disagreement with IRS

is resolved, and if anything will ultimately be owed, that amount is presently unknown.

**ANSWER**: Defendants deny that amount owed by Plaintiff is unknown, and allege that Plaintiff has

been faxed recent tax information and that Plaintiff is responsible for the $13,885.41 in its entirety

per the terms of the Agreement.

      y.     <u>Section 28:  $38,863.45 for Third Quarter 2007 FICA, federal and state</u>

<u>unemployment tax, and state and federal withholdings</u>.  These amounts have been previously paid,

and are therefore not owed by Plaintiff.

**ANSWER**:  Defendants deny that Plaintiff is not responsible for the amounts set forth in Paragraph

47y and deny that she has paid her obligations under Section 6 of the Agreement.  Defendants assert

that, in paragraph 47y, no distinction is made between state and federal withholding and FICA,

FUTA, and SUTA, and that the allegations therein are therefore false and misleading.

      z.     <u>Section 29:  Alleged $44,004.03 for Fourth Quarter 2007 FICA, federal and state</u>

<u>unemployment tax, and state and federal withholdings</u>.  These amounts are the responsibility of

Defendants pursuant to Paragraph 5(a) of the Agreement.

**ANSWER**:  Defendants deny that they are responsible for federal and state withholding under

Section 5(a) of the Agreement.  Defendants assert that, in paragraph 47z, no distinction is made

between state and federal withholding and FICA, FUTA, and SUTA, and that the allegations therein

are therefore false and misleading.

      aa.    <u>Section 30:  Alleged $1,643.19 for Federal Unemployment</u>.  Federal unemployment

taxes owed for the last three quarters of 2007 have not yet been calculated.

**ANSWER**:  Defendants deny the allegations in Paragraph 47aa and assert that Plaintiff is responsible for all federal unemployment taxes still owing for 2007.

48.  There may be additional sums which the Defendants will claim are owed by the Plaintiff under the Agreement, which it is necessary to ascertain and liquidate in order to avoid repetitious litigation.

**ANSWER**:  Defendants admit the allegations contained in Paragraph 48.

49.   Pursuant to 735 ILCS 5/2-701 and other applicable law, the Court has jurisdiction to declare the rights of the parties with respect to the sums which Defendants claim are due from Plaintiff, above.

**ANSWER**:  Defendants deny that Plaintiff is entitled to the relief sought in Paragraph 49.

<div align="center">

**PLAINTIFF'S COUNT II - RESCISSION**

</div>

50.   Paragraphs 1 thru 49 are incorporated herein by reference.

**ANSWER**:  Defendants restate their answers to Paragraphs 1 through 49 as if fully set forth herein.

51.   In addition to claims comprised of the unauthorized bonuses and undisclosed mileage claims totaling at least $17,756.24, approximately another $1,250.00 in payments for patient services, on information and believe, was diverted by the Defendants in that the payments were made in 2007 but not sent by the Defendants to Plaintiff for deposit to the Corporation's accounts at that time; instead, those sums were re-billed after Closing, and presumably deposited thereafter in accounts belonging to the Defendants, in an apparently deliberate effort to deprive Plaintiff of the benefit of this cash.

**ANSWER**:  Defendants deny that they diverted any of the moneys referenced in Paragraph 51, and assert that Defendants made no deliberate effort to deprive Plaintiff of the referenced funds, but

simply had ProvidrServ re-issue the checks that were lost, apparently in the summer and fall of 2007, at a cost of $800.00, post-Closing, to Defendants.

52.   Further, Larson, in breach of the warranties and fiduciary duties described above, and in furtherance of her misrepresentations by omission and constructive fraud described above, made unauthorized charges against the American Express Credit Card account of Plaintiff and not disclosed prior to Closing, including but not limited to: (i) at least $1,250.00 charged after the Closing; (ii) over $1,500.00 charged in December 2007 and January 2008 for rental of personal car at Enterprise by Defendant Shilts; (iii) at least $1,200.00 for personal purchases at Barnes & Noble and Amazon in December 2007; (iv) $267.00 for dinner at Morton's in Chicago; (v) at least $1,677.00 in supply purchase which the Defendants deliberately and surreptitiously accelerated during the period when the Agreement was being negotiated, in a bad faith effort to make those an unforeseen expense to the Plaintiff benefiting only the Defendants after Closing; (vi) $895.00 paid to APTA ( a professional organization) in December.

**ANSWER**:  Defendants deny that they made any misrepresentations by omission or constructive fraud or breached any warranty or fiduciary duty.  Defendants further deny that they needed authorization for the charges referenced in Paragraph 52.  Defendants allege that such charges were for 2007 expenses made in the ordinary course of business, and were consistent with expenses paid in previous years.  Defendants deny that Plaintiff is entitled to any setoff.  Plaintiffs deny that the charges references in items (i)-(vi) were unauthorized.

Defendants deny that the charges listed in item (i) were improper or unauthorized.  Item (i) refers to charges shown on the January American Express bill subsequent to Closing.  Defendants admit that that the following charges made for business expenses subsequent to Closing are the responsibility of Defendants: a charge for $51.14 to Amazon.com dated 1/08/08, a charge for

24

328.00 to USPS dated 1/08/08, a charge for $203.58 to Staples dated 01/08/08, and a charge for

$11.95 to Yahoo dated 1/18/08. Defendants assert that they have not yet reimbursed Plaintiff for

these small sums because Plaintiff continues to owe Defendants over $171,000.00 pursuant to the

Agreement. A copy of the January American Express bill, with Larson's notations, is attached

hereto as Exhibit B

Defendants assert that item (ii) refers to car rental expenses incurred by Shilts in December

2007 while her car was being repaired, after Shilts was in a car accident while working for the

Corporation. Both Larson and Shilts spoke with Plaintiff on the phone about renting a car so that

Shilts could continue working while her car was being repaired. Plaintiff approved the request for a

car rental, and indicated that she hoped a workers' compensation claim would not be filed by Shilts.

Defendants deny that the purchases described in item (iii) were personal, and assert that such

charges were for books and for $10 and $15 gift cards, which were given as Christmas gifts to the

Corporation's clients and per diem employees. This practice of gift-giving is consistent with gift-

giving practices of previous years. See Exhibit C.

Defendants assert that item (iv) that the charge for $267.00 at Morton's was for an employee

meal, and was consistent with practices in previous years. See Exhibit D.

Defendants assert that the amount in item (v), referencing payments to Econoprint, Staples,

FedEx, and the U.S. Postal Service, was for shipping costs and supplies for the clinic, which are

ordered from time to time as the clinic needs them. Defendants assert that these were ordinary and

necessary business expenses for which Larson did not need authorization.

Defendants assert that item (vi) was a proper charge for Larson's annual APTA dues and for

a book and CD needed by the clinic. Defendants assert that these were ordinary and necessary

business expenses and that no authorization was required for these charges.

25

53.   The sum of newly discovered claims and misappropriated funds resulting from Defendants; misrepresentations, fraudulent omissions, breach of fiduciary duty, and constructive fraud as described above, totaling at least $25,795.24, are material given the $100,001.00 purchase price under Section 2 of the Agreement.

**ANSWER**:  Defendants deny that they misappropriated funds, made any misrepresentations or fraudulent omissions, breached any warranty or fiduciary duty, or committed constructive fraud, and further deny liability for the $25,795.24 referenced in Paragraph 53.

54.  The Plaintiff would not have entered into the Release attached as Exhibit B had she known of the circumstances described above.

**ANSWER**:   Defendants deny the allegation in Paragraph 54, and assert that Plaintiff acted knowingly and willingly, under the assistance of counsel, in entering the Release.

### PLAINTIFF'S COUNT III – DAMAGES FOR BREACH OF WARRANTY, BREACH OF FIDUCIARY DUTY, AND FRAUD

55.  Paragraphs 1 thru 54 are incorporated herein by reference.

**ANSWER**:  Defendants restate their answers to Paragraphs 1 through 54 as if fully set forth herein.

56.  Plaintiff has been injured and has suffered damages in the sum of at least $25,795.24 referred to in Paragraph 53, above, as a direct and proximate result of the breach of warranties and fiduciary duties, misrepresentations by omission, and constructive fraud described above.

**ANSWER**:  Defendants deny all of the allegations set forth in Paragraph 56.

57.   In addition to the sum of $25, 795.24 referred to in Paragraph 53, above, Plaintiff has suffered additional damages as a direct and proximate result of the breach of warranties and fiduciary duties, misrepresentations by omission, and constructive fraud described above, comprised of additional unauthorized American Express Credit Card charges by Larson of at least $502.37 at DiMaggio's restaurant and $731.00 at Altman Luggage.

26

**ANSWER**:  Defendants deny the allegations in Paragraph 57, and assert that DiMaggio's is not a restaurant, but a car tire sales and service center.  Defendant Larson had new tires put on her car in December, in response to a conversation between Plaintiff, Shilts, and Larson about winter driving on work time and about adequate tires.  Plaintiff was aware of and approved the charge for car tires referenced in Paragraph 57, and a receipt for those charges is attached hereto as Exhibit E. Defendants further assert that the charge at Altman luggage was for staff Christmas gifts, the receipt for which is attached hereto as Exhibit F.  Defendants assert that Plaintiff was aware of this expenditure, that the expenditure was consistent with the practice of buying Christmas gifts for staff, clients, and per diem employees in past years (see Exhibit C), and that Plaintiff agreed in Section 11 of the Stock Purchase Agreement to "use all reasonable efforts to insure that the Corporation carries on its Business diligently and in substantially the same manner as heretofore."  See Exhibit A to Plaintiff's Complaint.

### PLAINTIFF'S COUNT IV - CONVERSION

58.  Paragraphs 1 thru 57 are incorporated herein by reference.

**ANSWER**:  Defendants restate their answers to Paragraphs 1 through 57 as if fully set forth herein.

59.  Plaintiff loaned to the Corporation an item of therapy equipment known as "Game Ready," valued at approximately $3,500.00, prior to the Closing.

**ANSWER**:  Defendants deny that Game Ready was loaned to the Corporation and allege that Game Ready is an asset of the Corporation.  Prior to Closing, Plaintiff never claimed that GL Rehabilitation Services, Ltd. ("GL Rehabilitation") did not own Game Ready or that Plaintiff expected to receive it back after the stock purchase transaction.

60.  After the Closing, Plaintiff made at least three (3) written demands upon Defendant Larson, by facsimile, that the Defendants return the Game Ready, but Defendants have refused.

**ANSWER**:  Defendants admit that Plaintiff asked for Game Ready via fax, but deny that they refused any request for its return.  Defendants further assert that their counsel sent a letter to Plaintiff's counsel on February 27, 2008, indicating that Plaintiff could either pick up Game Ready at any time, or that Defendants would have it delivered to Plaintiff.  A copy of the letter is attached hereto as <u>Exhibit G</u>.

61.  At all times, the Plaintiff had an absolute and unconditional right to immediate possession of the Game Ready.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 61 and deny that Game Ready is an asset of GL Rehabilitation.  Defendants assert that the Agreement, attached as Exhibit A to Plaintiff's Complaint, lists in Paragraph 4 the specific items of property which Plaintiff, the Seller, was entitled to retain and which Buyers, Larson and Shilts, were not entitled to acquire in the sales transaction.  Game Ready was not listed as one of such assets excluded from the sale, and Plaintiff therefore cannot establish that she has an absolute and unconditional right to Game Ready.

62.  The Defendants, jointly and severally, wrongfully and without authorization, assumed control, dominion, or ownership over the Game Ready, and have refused to turn it over in response to the demand by the Plaintiff.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 62, deny that they refused any request for its return, and allege that Game Ready is an asset of GL Rehabilitation.  Notwithstanding the foregoing, Defendants assert that, in an attempt to dispose of this baseless claim by Plaintiff, Defendants' counsel sent a letter to Plaintiff's counsel on February 27, 2008, indicating that Plaintiff could either pick up Game Ready at any time, or that Defendants would have it delivered to Plaintiff.  <u>See</u> <u>Exhibit G</u>.

28

63.  As a direct and proximate result of the Defendants' foregoing conduct, the Plaintiff has suffered damages in an amount equal to the fair market value or replacement cost of the Game Ready.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 63.

64.  Defendant Larson acted intentionally, with malice, and with specific intent to harm the Plaintiff in refusing to return the Game Ready.

**ANSWER**:  Defendants deny the allegations contained in Paragraph 64.

### DEFENDANTS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendants Ilene Larson and Jeanne Shilts, by their attorneys, Stroud, Willink & Howard, LLC, for their affirmative defense and counterclaims against Plaintiff, Carol Gordon, hereby state as follows

### AFFIRMATIVE DEFENSES

Plaintiff's claims are barred, foreclosed, and precluded by virtue of the following:

### FIRST AFFIRMATIVE DEFENSE
### GAME READY IS AN ASSET OF GL REHABILITATION

65.  As an affirmative defense to Plaintiff's allegations of conversion, Defendants assert that Game Ready is an asset of GL Rehabilitation.

66. The Stock Purchase Agreement, attached as Exhibit A to Plaintiff's Complaint, lists in Section 4 the specific items of property which Plaintiff, the Seller, was entitled to retain and which Buyers, Larson and Shilts, were not entitled to acquire in the sales transaction.

67. Game Ready was not listed in Section 4 as one of the assets excluded from the sale, and Plaintiff cannot establish that she has an absolute and unconditional right to Game Ready, nor that Defendants converted Game Ready.

68. Notwithstanding the foregoing, Defendants' counsel sent a letter to Plaintiff's counsel on February 27, 2008, indicating that Plaintiff could either pick up Game Ready at any time, or that Defendants would have it delivered to Plaintiff.  See Exhibit G.

69. Plaintiff signed a valid Release, by which she released GL Rehabilitation from "any and all claims and liabilities of any nature."  See Exhibit B to Plaintiff's Complaint.

70. In Count IV, Plaintiff has failed to state a claim upon which relief may be granted.

WHEREFORE, Defendants ask this court to enter an order dismissing Count IV in its entirety.

## SECOND AFFIRMATIVE DEFENSE
## ESTOPPEL

71.  Plaintiff misrepresented in the Agreement that she owned all of the Corporation's assets free and clear of liabilities when, in fact, two Liens existed against the Corporation's assets.

72. Plaintiff misrepresented the Corporation's financial condition when she warranted in Section 7 of the Agreement that the Corporation's Balance Sheet as of September 30, 2007, was accurate.

73.  Plaintiff concealed material facts from Defendants concerning the Corporation's financial condition.

74. Plaintiff made these representations regarding the Corporation's assets and financial condition with knowledge that they were untrue.

75.  Plaintiff intended or reasonably expected that Defendants would act in reliance upon her representations.

76. Defendants did not know when they entered the Agreement that Plaintiff's representations regarding the Corporation's assets and financial condition were untrue.

77. Defendants justifiably and in good faith relied upon Plaintiff's misrepresentations to their detriment when Defendants negotiated and executed the Agreement.

78. Defendants will be further prejudiced by their reliance upon Plaintiff's misrepresentations if Plaintiff is allowed to pursue the claims in Counts I-IV against Defendants.

79. Plaintiff is therefore equitably estopped from asserting the claims in Counts I-IV against Defendants.

WHEREFORE, Defendants ask this his court to enter an order dismissing Counts I-IV for failure to state claims upon which relief may be granted.

## THIRD AFFIRMATIVE DEFENSE
## UNCLEAN HANDS

80. Plaintiff's acted in bad faith with respect to the stock sale when she made misrepresentations and omissions of material fact to induce Defendants to enter to Agreement, then failed to perform her obligations under the agreement.

81.  The doctrine of unclean hands precludes Plaintiff from taking advantage of her own wrongs with respect to the stock sale, and bars her from receiving any relief from this Court regarding that transaction.

WHEREFORE, Defendants ask this his court to enter an order dismissing Counts I-IV for failure to state claims upon which relief may be granted.

## FOURTH AFFIRMATIVE DEFENSE
## WAIVER AND RELEASE

82. Plaintiff knowingly and willingly relinquished her right to recover from Defendants when she signed the Release, which is clear and unambiguous.  A copy of the Release was attached as Exhibit B to Plaintiff's Complaint.

83.  Plaintiff waived and released her right to pursue any claim or liability of any nature against Defendants; therefore, her claims under Count I-IV are barred.

WHEREFORE, Defendants ask this his court to enter an order dismissing Counts I-IV for failure to state claims upon which relief may be granted.

## FOURTH AFFIRMATIVE DEFENSE
## PAROL EVIDENCE

84. Section 17 of the Agreement states, "This Agreement constitutes the entire agreement between the Parties and supersedes any prior agreement or understanding."

85. To the extent that Plaintiff's claims rely on extrinsic evidence outside the four corners of the Agreement, such claims are barred by the parole evidence rule.

## COUNTERCLAIM #1
## BREACH OF CONTRACT

86. On or about December 31, 2007, Defendants entered into a certain Stock Purchase Agreement ("Agreement") with Plaintiff, a copy of which was attached to Plaintiff's Complaint as Exhibit A.

87. Pursuant to the Agreement, Plaintiff sold to Defendants one thousand (1,000) shares of GL Rehabilitation's stock (hereinafter the "Shares"), which represented all of the issued and outstanding shares of GL Rehabilitation's stock.

88. Pursuant to Sections 6 and 9 of the Agreement, Plaintiff agreed to be responsible for payment and satisfaction of all financial obligations and liabilities of GL Rehabilitation that arose or were incurred prior to the closing date of January 1, 2008 ("Closing "), except for the salaries and wages of GL Rehabilitation's employees arising after December 28, 2007.

89. Plaintiff has failed to pay for $169,575.70 worth of GL Rehabilitation liabilities incurred and outstanding as of the Closing, in breach of Sections 6 and 9 the Stock Purchase Agreement.

90. Defendants' counsel sent a letter to Plaintiff on January 28, 2008, detailing the outstanding liabilities owed to Defendants by Plaintiff pursuant to the Agreement.  A copy of the letter and accompanying spreadsheet was attached as Exhibit F to Plaintiff's Complaint.

91. Since that letter was sent, Defendants have learned that Plaintiff has retained Medicare checks issued to GL Rehabilitation subsequent to the Closing date for services rendered in the amount of approximately $2,400.00, in further breach of the Stock Purchase Agreement.

92. Plaintiff also breached Section 4(c) and Section 8 of the Agreement by writing checks prior to Closing when there were insufficient funds in the Corporation's account to cover the checks, and by making withdrawals out of the Corporation's account after January 1, 2008.

93. Plaintiff's withdrawal and spending of funds resulted in an overdraft of GL Rehabilitation's account with Midwest Bank.

94. Plaintiff never provided Defendants Larson and Shilts with any information regarding the status of the Corporation's bank account prior to Closing, in breach of Plaintiff's obligation pursuant to Section 11 of the Agreement to make such information available to Defendants.

95. Plaintiff failed to disclose the liabilities she incurred on behalf of the Corporation in the form of overdraft checks, in violation of Section 14 of the Agreement.

96. Plaintiff failed to disclose two liens against the Corporation, one against the Corporation's $100,000 line of credit with Midwest Bank and another, lien number 010099404 filed by VGM Financial Services, against equipment leased by the Corporation (collectively, the "Liens"),  in violation of Section 14 of the Agreement.

97. Plaintiff failed to turn over the Corporation's records to Defendants after the Closing, in violation of Section 12 of the Agreement.

98. Defendants have performed all of their obligations under the Agreement.

99. Plaintiff's breach of the Agreement has caused Defendants to suffer monetary damages in the amount of at least $171,975.70.

**WHEREFORE**, Defendants pray for judgment against Plaintiff a follows:

(a)  a judgment in favor of Defendants and against Plaintiff under Defendants' First Claim for Relief;

(b) such other relief as this Court deems just and equitable.

## COUNTERCLAIM #2
## BREACH OF EXPRESS WARRANTY

100. Defendants restate and reallege Paragraphs 65 through 99 as though fully set forth herein.

101. In paragraph 1 of the Agreement, Plaintiff represented that she owned all shares of the Corporation free and clear of any encumbrances.

102. Plaintiff expressly warranted in Paragraph 13 of the Agreement that the Corporation was in good standing, that she had no knowledge of any claims or liabilities not previously disclosed, and that she had made no material changes to or incurred any liability with respect to the Corporation except as provided in the Agreement.

103. Plaintiff expressly warranted in Section 7 of the Agreement that the Corporation's Balance Sheet as of September 30, 2007, was accurate.

104. Plaintiff expressly warranted in Section 1 of the Agreement that she owned all of the Corporation's shares "free and clear of any security interest, lien, encumbrance or claim of any other person or entity."

105. Shortly after Closing, Defendants discovered that the Corporation's bank account at Midwest Bank was in overdraft condition, and that there were two Liens against the Corporation's assets.

34

106. Plaintiff's failure to disclose information to Defendants regarding the Liens and the state of the Corporation's account at Midwest Bank constitutes a breach of the express warranties Plaintiff made in the Agreement.

107. As of the date of this Complaint, the lien against the line of credit at Midwest Bank has been satisfied, but Plaintiff has not yet satisfied and released lien number 010099404.

WHEREFORE, Defendants pray for judgment against Plaintiff a follows:

(a)  a judgment in favor of Defendants and against Plaintiff under Defendants' Second Claim for Relief;

(b) a money judgment in favor of Defendants sufficient to satisfy the above-mentioned equipment lien, and sufficient to reimburse GL Rehabilitation for any and all amounts paid in satisfaction of the lien against the Corporation's line of credit at Midwest Bank;

(c) such other relief as this Court deems just and equitable.

<div style="margin-left:50%">

  /s/  Susan B. Parsons
Susan B. Parsons
(f/k/a Susan B. Gloss)
Attorney for Defendants Ilene Larson, Jeanne
Shilts, and GL Rehabilitation Services, Ltd.
ARDC # 6282963
STROUD, WILLINK, & HOWARD, LLC
25 West Main Street, Suite 300
Madison, WI 53701
sparsons@stroudlaw.com
(608) 257-2281

</div>

35