UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL M. GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 1373 |
| v. | ) | |
| | ) | Honorable Judge Joan B. Gottschall |
| ILENE LARSON, JEANNE SHILTS, and GL | ) | |
| REHABILITATION SERVICES, LTD., an Illinois | ) | |
| Corporation, | ) | |
| Defendants. | ) | JURY DEMANDED |

## **APPENDIX**

### **State Cases Cited**

Gregg I. Minkow
Max J. Kanter
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, IL  60601-1081
(312) 704-3000
Atty. #6181058
gminkow@hinshawlaw.com

**Westlaw.**

581 N.E.2d 206
222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255
**(Cite as: 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255)**

**H**
Calumet Const. Corp. v. Metropolitan Sanitary
Dist. of Greater Chicago
Ill.App. 1 Dist.,1991.

Appellate Court of Illinois,First District, First Division.
CALUMET CONSTRUCTION CORPORATION,
Plaintiff-Appellant,
v.
The METROPOLITAN SANITARY DISTRICT
OF GREATER CHICAGO, Defendant-Appellee.
No. 1-89-1933.

Sept. 30, 1991.

Contractor brought suit against sanitary district for breach of contract and for return of liquidated damages withheld by sanitary district for alleged delays in contractor's performance under construction contract. The Circuit Court of Cook County, Robert L. Sklodowski, J., granted contractor's motion for partial summary judgment on liquidated damages issue, but refused to assess prejudgment interest against sanitary district. Appeals were taken. The Appellate Court, 178 Ill.App.3d 415, 127 Ill.Dec. 581, 533 N.E.2d 453, reversed and remanded. The Circuit Court, Walter J. Kowalski, J., rendered judgment on delay damages issue and appeal was taken. The Appellate Court, Manning, P.J., held that contractor's delay damages were limited by clause in contract.

Affirmed.

West Headnotes

**[1] Public Contracts 316A ⚖══22**

316A Public Contracts
    316AI In General
        316Ak19 Performance or Breach
            316Ak22 k. Delay. Most Cited Cases
Contractor was precluded from receiving equitable adjustment for delay damages under suspension of work clause of federal appendix to public contract where suspension of work clause stated that no equitable adjustment could be made for delay damages if such adjustment was provided for or excluded under any other provision of contract and clause in contract specifically listed what damages were recoverable due to delay by public agency; contractual clause outlining recoverable damages did not conflict with suspension of work clause of federal appendix and, thus, contractor's recovery for delay damages was limited by contractual clause.

**[2] Contracts 95 ⚖══143.5**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143.5 k. Construction as a Whole. Most Cited Cases
Construction of contract should be adopted which harmonizes all various parts so that no provision is deemed conflicting with, repugnant to, or neutralizing of any other.

**[3] Public Contracts 316A ⚖══16**

316A Public Contracts
    316AI In General
        316Ak16 k. Construction and Operation. Most Cited Cases
Clauses in construction contracts limiting damages are in public interest by protecting public agency against vexatious litigation based on claims, real or fancied, that agency has been responsible for unreasonable delays.

**[4] Public Contracts 316A ⚖══22**

316A Public Contracts
    316AI In General
        316Ak19 Performance or Breach
            316Ak22 k. Delay. Most Cited Cases
Suspension of work clause of federal appendix to public construction contract, which stated that no equitable adjustment for delays would be made if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

581 N.E.2d 206
222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255
(Cite as: 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255)

adjustment was "provided for or excluded under any other provision of this subagreement," did not apply only to federal clauses but, rather, applied to entire contract.

**[5] Pleading 302 ⚫══236(5)**

302 Pleading
   302VI Amended and Supplemental Pleadings and Repleader
      302k233 Leave of Court to Amend
         302k236 Discretion of Court
            302k236(5) k. Amendment to Conform to Proofs. Most Cited Cases
Trial court did not abuse its discretion in refusing to allow contractor to amend its complaint against public agency to allege bad faith where evidence produced by contractor did not support allegation of bad faith.

**[6] Pleading 302 ⚫══242.1**

302 Pleading
   302VI Amended and Supplemental Pleadings and Repleader
      302k242 Amendment of Declaration, Complaint, Petition, or Statement
         302k242.1 k. In General. Most Cited Cases
      (Formerly 302k242)
In order that litigants may fully present their causes of action and settle their controversies on the merits, greatest liberality should be provided in allowing amendments to complaints.

**[7] Contracts 95 ⚫══168**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k168 k. Terms Implied as Part of Contract. Most Cited Cases
Every contract implies good faith and fair dealing between parties to it, and where instrument is susceptible of two conflicting constructions, one which imputes bad faith to one party and another which

does not, latter construction should be adopted.

**207 *375 ***256 O'Brien, O'Rourke, Hogan & McNulty (Donald V. O'Brien, and Michael Gilman, of counsel), Chicago, for plaintiff-appellant.
Jack L. Shankman, Sr. Asst. Atty., and James B. Murray, Head Asst. Atty., Chicago, for defendant-appellee.
Presiding Justice MANNING delivered the opinion of the court:
On September 15, 1983, plaintiff, Calumet Construction Corporation, entered into a contract with defendant, The Metropolitan Sanitary District. In accordance with the contract, plaintiff agreed to construct six sludge digestion tanks, three boilers, a methane gas compressor building and to perform rehabilitation work on 12 existing sludge tanks. Plaintiff agreed to perform these services at a cost to defendant of $22,575,000 and to complete the work within 900 days.

The United States Environmental Protection Agency (hereinafter "EPA") funded a major percentage of the expenditures for the project. In accordance with its funding guidelines, the contract contained the standard Federal appendices (appendix B), as well as general condition provisions. The "suspension of work" clause in appendix B provided that an "equitable adjustment" could be made for delay damages except where such an adjustment was provided for or excluded *376 under any other provision of the contract. Article 27 of the general conditions provisions specifically listed what damages were recoverable due to delay by defendant.

Plaintiff did not complete the project within the 900-day period due to problems attributable to defendant. Plaintiff charged that on October 10, 1983, defendant directed it not to proceed on the sludge grinding system and that directions to continue the project were not given until June 28, 1984. Plaintiff further charged that defendant issued a change order without extending the time within which the modification should be completed. Plaintiff asserted that these actions and others by defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

581 N.E.2d 206
222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255
(Cite as: 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255)

caused delay damages and that it incurred extra work as a direct result of these problems.

[1] Plaintiff filed a complaint against defendant seeking declaratory relief for damages resulting from the delays and interference with its performance. The complaint was filed before the contract was substantially performed and sought "equitable adjustments" in the contract price and performance time totaling $4,300,000.

On January 17, 1989, defendant filed a motion for partial summary judgment. Defendant alleged that plaintiff was precluded from receiving an "equitable adjustment" to the contract under the "suspension of work" clause of the Federal appendix to the contract, and that plaintiff's delay damages were limited by article 27 of the general conditions provisions.

On January 27, 1989, the trial court granted defendant's motion for partial summary judgment. The court held that article 27 of the general conditions applied to the suspension of work "equitable adjustment" provision of the contract; therefore,**208 ***257 plaintiff's damages for delay were precluded. The court also held that the exclusionary language of article 27 applied to the provision covering "changes and differing site conditions." Thereafter, plaintiff filed a motion to reconsider and a motion requesting leave to file an amended complaint. These motions were denied. The parties reached a settlement; however, they reserved the right to appeal the court's January 27, 1989, ruling. On July 11, 1989, plaintiff filed its appeal.

Plaintiff argues on appeal that the trial court erred in finding that the "no damages for delay" general conditions provisions of the contract barred it from recovering under one of the "equitable adjustment" provisions of the same contract. Defendant does not deny that the delays complained of were attributable to it; however, defendant maintains that any recovery was properly limited by the language of article 27 of the general conditions of the contract and the "suspension of work" clause in the Federal

appendix to the contract.

*377 Article 27 of the general conditions of the contract provides in pertinent part:

"Should the contractor be obstructed or delayed in the commencement, prosecution or completion of the work hereunder by any act or delay of the Sanitary District, or by inability, with the exercise of due diligence; to obtain necessary railroad and transportation facilities, * * * the times fixed in the Agreement for the completion of said work to the extent specified shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes mentioned * * *."

* * * * * *

"The Contractor shall not be entitled to any damages or compensation from the Sanitary District except on account of any delay or delays resulting from any act or delay of the Sanitary District or other parties under contract with the Sanitary District, and such damages shall be limited solely to premiums actually paid by the Contractor on his bond and for wages and salaries of employees and other extra expenses of the Contractor that are necessary only for the proper maintenance of the work and of the plant and equipment of the Contractor during or on account only of a delay or delays caused by the Sanitary District or other contractors for said Sanitary District."

The "suspension of work" clause provides that:

"(b) If the performance of all or any part of the work is suspended, delayed or interrupted for an unreasonable period of time by an act of the recipient in administration of this subagreement, an adjustment shall be made for any increase in the cost of performance of this subagreement (excluding profit) necessarily caused by such unreasonable suspension, delay or interruption and the contract modified in writing. However, no adjustment shall be made under this clause for any suspension, delay or interruption to the extent * * *. (2) for which an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# HINSHAW

equitable adjustment is provided for or excluded under any other provision of this subagreement."

The appendix to the contract defines subagreement as:

"A written agreement between an EPA recipient and another party (other than another public agency) and any lower tier agreement for services, supplies, equipment, or construction necessary to complete the project. Subagreements include contracts and subcontracts for personal, and professional services, agreements with consultants, and purchase orders."

*378 Plaintiff contends that the clause contained in the suspension of work "equitable adjustment" provision refers solely to the other provisions contained in the appendix, and not to the general conditions of the contract. Plaintiff maintains that there are only three provisions of the contract which refer to equitable adjustment and that all three are contained in appendix B. He argues that because article 27 of the general conditions does not use the term "equitable adjustment," that the "suspension of work clause" cannot be construed to refer to article 27.

***258 **209 [2][3] It is a well established principle in the law of contracts that a construction should be adopted which harmonizes all the various parts so that no provision is deemed conflicting with or repugnant to, or neutralizing of any other. (*Zannis v. Lake Shore Radiologists, Ltd.* (1979), 73 Ill.App.3d 901, 906, 29 Ill.Dec. 569, 392 N.E.2d 126.) Clauses in construction contracts limiting damages are in the public interest by protecting public agencies against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays. *Anthony P. Miller, Inc. v. Wilmington Housing Authority* (1958), 165 F.Supp. 275.

[4] In this case, the contract in dispute involved delays in a construction project. As a recipient of EPA funding for the construction project, plaintiff

was bound by the appendix to that contract, specifically, the "suspension of work clause." The suspension of work clause is a federally required provision which is included in all construction contracts that receive EPA funding. That clause clearly states that no equitable adjustment for delays will be made if an adjustment is provided for or excluded under any other provision of the subagreement. As stated earlier, a subagreement is defined in the appendix as a written agreement between an EPA recipient and any lower tier agreement for services, supplies, equipment or construction necessary to complete the project.

Plaintiff maintains that this provision should be read to apply only to Federal clauses and not to the entire contract. Plaintiff offers no authority to support this assertion and we do not feel compelled to construe the language of the work suspension clause to impose that restriction. If the suspension of work clause was intended only to refer to Federal clauses it could easily have so stated.

Having determined that the suspension of work clause is not limited in its application to only Federal clauses, we discuss whether that clause is applicable to the general conditions of the contract, article 27. Plaintiff maintains that because the term "equitable adjustment" is not used in article 27 that this court cannot interpret the suspension *379 of work provision to refer to that article. Plaintiff asserts that defendant drafted the contract and could have specified in unambiguous terms that no "equitable adjustment" would be granted for delay.

As we noted earlier, the general conditions of the contract, specifically article 27, limit a contractor's recovery for delay damage.

"Recovery is limited to premiums actually paid by the contractor on his bond and for wages and salaries of employees and other extra expenses of the contractor that are necessary only for the proper maintenance of the work and of the plant and equipment of the contractor during or because of the defendant's delay."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Arizona   California   Florida   Illinois   Indiana   Massachusetts   Minnesota   Missouri   New York   Oregon   Rhode Island   Wisconsin

# HINSHAW

581 N.E.2d 206                                                                                      Page 5
& 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255
**(Cite as: 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255)**

Plaintiff cites *C.H. Leavell & Co. v. United States* (1976), 530 F.2d 878, for the proposition that the Federal government provides a contractual basis to compensate contractors for government-caused delays by incorporating an "equitable adjustment" provision in its construction contracts. Plaintiff also cites *S.N. Nielson Co. v. Public Building Commission of Chicago* (1980), 81 Ill.2d 290, 43 Ill.Dec. 40, 410 N.E.2d 40, for the proposition that contractual remedies should be broadly construed to achieve their intended goal. However, here the contractual remedy for delay was specifically included in article 27. Therefore, we find no need to broadly construe the contractual remedies. In *Granite Construction v. MSDGC* (N.E.Ill.1982), No. 80 C 5877, plaintiff argued that delay damages should have been calculated pursuant to the Federal suspension of work clause instead of article 27 of the contract because the two provisions conflicted with each other. The court held that the clauses did not conflict and that article 27 controlled the measure of delay damages.

Plaintiff's reliance on *C.H. Leavell & Co.* is unpersuasive. In that case, the clauses at issue were the "work suspension clause" and the "funds available clause." The funds available clause provided that in the event that there were not sufficient funds to cover the project, the owner was not **210 ***259 liable for damage caused by any resulting delay. The court held that the funds available clause did not bar the contractor from receiving an equitable adjustment. That case is distinguishable from the instant case. In this case, defendant directed plaintiff to discontinue its work on the construction project and also issued a change order further delaying completion of the project. Moreover, the defendant's contract here specifically stated what damages were recoverable if the project was delayed by defendant.

Plaintiff's reliance on *Ruffin Woody & Associates v. Person County* (1988), 92 N.C.App. 129, 374 S.E.2d 165, is also misplaced. *380 The contract there made the architect's decisions subject to arbit-

ration and mandated arbitration of all claims or disputes unless the parties mutually agreed otherwise. However, the general conditions provision in that contract provided that the architect/engineer's decision was "final and conclusive, except as otherwise expressly provided." The court determined that there was a conflict between the provisions and that the general conditions controlled.

In this case, we find no conflict between the general conditions of the contract and the Federal appeals or work suspension provision. Further, unlike the contract in *Ruffin*, the Federal "suspension of work" clause in this contract clearly allowed for an equitable adjustment to be provided or excluded by any other provision in the contract. Moreover, Illinois and Federal courts have recognized that the amounts recoverable under an equitable adjustment clause can be limited by other provisions of the contract. *Blinderman Constr. Co. v. MSDGC* (1988), No. 82 CH 1183; *Granite Constr. v. MSDGC* (1982), No. 80 C 5877. Therefore, we hold that the general conditions provisions of the contract do not conflict with the suspension of work provisions and that plaintiff's recovery for delay damages was properly limited by article 27 of the general conditions provisions.

Plaintiff argues in the alternative that its remedy for delay damages is not precluded by other provisions of the equitable adjustment clauses. Plaintiff relies on the "changes and differing site conditions" provisions contends that its complaint seeks to recover costs created by changes that led to disruption and delay.

We again point out that the Federal "changes" and "changed conditions" clauses of the contract here provide for an equitable adjustment where the contractor performs unspecified extra work. However, the damages recoverable in that instance are set forth in articles 7 and 8 of the general conditions and provide that the contractor may recover cost of labor plus 15% markup, the cost of materials, plus 10% markup and the actual cost of equipment. This measure of damages has been held to apply to con-

**ATTORNEYS AT LAW**

222 North LaSalle Street

Chicago, IL 60601-1081

312-704-3000

312-704-3001 (fax)

www.hinshawlaw.com

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# HINSHAW

581 N.E.2d 206                                                                    Page 6
& 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255
**(Cite as: 222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255)**

structions contracts. *Walsh Constr. v. MSDGC* (1980), No. 79 L 5832. For the foregoing reasons, we find that plaintiff's recovery was properly limited by the general conditions provisions of the contract.

[5] Plaintiff next argues that the trial court erred in denying it leave to file an amended complaint. Specifically, plaintiff asserts that by granting partial summary judgment in favor of defendant that the judgment rendered was non-final and capable of being amended.

**\*381** [6] The right of a party to amend its complaint is a matter within the sound discretion of the trial court. (*Mundt v. Ragnar Benson, Inc.* (1975), 61 Ill.2d 151, 335 N.E.2d 10.) In order that litigants may fully present their causes of action and settle their controversies on the merits, the greatest liberality should be provided in allowing amendments. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill.App.3d 1069, 110 Ill.Dec. 131, 510 N.E.2d 1162.) The court's determination will not be disturbed on appeal except where there is a clear or manifest abuse of that discretion. *Baker v. Walker* (1988), 173 Ill.App.3d 836, 123 Ill.Dec. 621, 528 N.E.2d 5.

[7] Here, the plaintiff initially sought a motion for partial summary judgment to determine if the damages recoverable by it would be calculated in accordance with the terms of the contract provisions. Plaintiff **\*\*211 \*\*\*260** sought leave to amend its complaint by alleging bad faith. This occurred after discovery was closed and the case was prepared for trial. There is no evidence in the record to support a pleading of bad faith, nor did the evidence that plaintiff produced support this allegation. Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. *Pierce v. MacNeal Memorial Hosp. Ass'n* (1977), 46 Ill.App.3d 42, 4 Ill.Dec. 615, 360 N.E.2d 551. Because the evidence produced by plaintiff did not support an allegation of bad faith, we cannot say

that the trial abused its discretion in failing to allow plaintiff to amend its complaint.

**ATTORNEYS AT LAW**

Accordingly, the judgment of the circuit court of 222 North LaSalle Street
Cook County is affirmed.                                     Suite 300
                                                             Chicago, IL 60601-1081

AFFIRMED.

                                                             312-704-3000
CAMPBELL and O'CONNOR, JJ., concur.
                                                             312-704-3001 (fax)
Ill.App. 1 Dist.,1991.
Calumet Const. Corp. v. Metropolitan www.hinshawlaw.com
Dist. of Greater Chicago
222 Ill.App.3d 374, 581 N.E.2d 206, 163 Ill.Dec. 255

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Arizona   California   Florida   Illinois   Indiana   Massachusetts   Minnesota   Missouri   New York   Oregon   Rhode Island   Wisconsin

Westlaw.

648 N.E.2d 317                                                          Page 1
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

▷
Carlile v. Snap-on Tools
Ill.App. 4 Dist.,1995.

Appellate Court of Illinois,Fourth District.
Bruce CARLILE, Plaintiff-Appellant,
v.
SNAP-ON TOOLS and Charles Johnson, Defend-
ants-Appellees.
No. 4-94-0743.

Argued Feb. 14, 1995.
Decided March 23, 1995.
Rehearing Denied April 27, 1995.

Former dealer filed action against manufacturer as-
serting claims of fraudulent misrepresentation and
breach of contract. The Circuit Court, Sangamon
County, Stuart H. Shiffman, J., entered summary
judgment in favor of manufacturer based upon re-
lease in dealership termination agreement. Appeal
was taken. The Appellate Court, Cook, J., held that:
(1) words of general release in termination agree-
ment did not defeat former dealer's subsequent
claim for fraud which was not in dealer's mind at
time he signed agreement; (2) genuine issue of ma-
terial fact existed, precluding summary judgment,
on whether manufacturer's conduct in recruiting
dealer and terminating dealership was sufficiently
tainted with fraud or wrongdoing to allow dealer to
invalidate release on ground of economic duress;
and (3) dealer's acceptance of payment for invent-
ory repurchased by manufacturer at time of termin-
ation was not ratification of general release.

Reversed and remanded.

West Headnotes

**[1] Release 331 ⟨⟩1**

331 Release
    331I Requisites and Validity
        331k1 k. Nature and Requisites in General.
Most Cited Cases

**Release 331 ⟨⟩17(.5)**

331 Release
    331I Requisites and Validity
        331k17 Fraud and Misrepresentation
            331k17(.5) k. In General. Most Cited Cases
Public policy favors settlement of claims, and it is
important not to resurrect claims that have been
fairly resolved, but releases should not be used as
instruments of fraud or oppression.

**[2] Release 331 ⟨⟩30**

331 Release
    331II Construction and Operation
        331k30 k. Scope and Extent in General. Most
Cited Cases
Scope and effect of release is controlled by inten-
tion of parties as discerned from language used and
circumstances of transaction; release cannot be con-
strued to include claims not within contemplation
of parties.

**[3] Release 331 ⟨⟩31**

331 Release
    331II Construction and Operation
        331k31 k. General Release. Most Cited Cases
If release contains words of general release in addi-
tion to recitals of specific claims, then words of
general release are limited to particular claim to
which reference is made, and if there are only
words of general release, then courts will restrict
release to thing intended to be released and will re-
fuse to interpret generalities so as to defeat valid
claim not then in minds of parties; general release
is inapplicable to unknown claim.

**[4] Release 331 ⟨⟩15**

331 Release
    331I Requisites and Validity
        331k15 k. Reality of Assent in General. Most
Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

Page 2

**Release 331 ☞16**

331 Release
    331I Requisites and Validity
        331k16 k. Mistake. Most Cited Cases

**Release 331 ☞17(1)**

331 Release
    331I Requisites and Validity
        331k17 Fraud and Misrepresentation
            331k17(1) k. Indebtedness or Liability in General. Most Cited Cases

**Release 331 ☞18**

331 Release
    331I Requisites and Validity
        331k18 k. Duress. Most Cited Cases
Even if parties intend to release specific claim, release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability.

**[5] Release 331 ☞31**

331 Release
    331II Construction and Operation
        331k31 k. General Release. Most Cited Cases
Words of general release in dealership termination agreement did not defeat former dealer's subsequent claim for fraud which was not in dealer's mind at time he signed agreement; manufacturer and former dealer did not discuss any fraud claim, but rather discussed only manufacturer's payment for value of dealer's inventory.

**[6] Contracts 95 ☞95(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(1) k. In General. Most Cited Cases
Economic duress is present if one is induced by wrongful act of another to make contract under cir-

cumstances depriving him or her of exercise of free will.

**[7] Contracts 95 ☞95(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(1) k. In General. Most Cited Cases

**Contracts 95 ☞95(3)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(3) k. Threats in General. Most Cited Cases
Acts or threats cannot constitute duress unless they are wrongful, and wrongfulness extends to acts that are wrongful in moral sense, as well as acts which are criminal, tortious, or in violation of contract duty.

**[8] Contracts 95 ☞95(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(1) k. In General. Most Cited Cases

**Contracts 95 ☞95(3)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(3) k. Threats in General. Most Cited Cases
Duress cannot be predicated upon demand which is lawful, or upon doing or threatening to do that which one has legal right to do, such as filing justifiable statutory lien.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

**[9] Contracts 95 ☞95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited Cases
Defense of duress does not apply if consent to agreement is secured from mere hard bargaining or pressure of financial circumstances; agreement may be invalidated on basis of duress only if conduct of party obtaining advantage is manifestly tainted with degree of fraud or wrongdoing.

**[10] Judgment 228 ☞181(33)**

228 Judgment
   228V On Motion or Summary Proceeding
     228k181 Grounds for Summary Judgment
       228k181(15) Particular Cases
         228k181(33) k. Tort Cases in General. Most Cited Cases
Genuine issue of material fact existed, precluding summary judgment for manufacturer, on whether manufacturer's conduct in recruiting dealer and terminating dealership was sufficiently tainted with fraud or wrongdoing to allow former dealer to invalidate general release in dealership termination agreement on ground of economic duress; dealer did not owe anything to manufacturer at time of termination, but manufacturer allegedly pressured dealer to sign release or suffer lengthy delays in obtaining payment for inventory repurchased by manufacturer.

**[11] Evidence 157 ☞434(1)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(B) Invalidating Written Instrument
       157k434 Fraud
         157k434(1) k. In General. Most Cited Cases
Fraud, even in inducement, may justify considera-

tion of prior understandings which would otherwise be excluded under parol evidence rule.

**[12] Contracts 95 ☞95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited Cases
Party's will is less likely to have been overcome by economic duress if he or she has had ample time for inquiry, examination and reflection, and thus, it is easier to rebut defense of economic duress if plaintiff is aware of claims he or she has waived and has had an opportunity to consult with attorney.

**[13] Contracts 95 ☞97(2)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k97 Estoppel and Ratification
         95k97(2) k. What Constitutes Ratification. Most Cited Cases
Victim of duress who accepts benefits flowing from contract for any considerable length of time ratifies contract.

**[14] Release 331 ☞21**

331 Release
   331I Requisites and Validity
     331k21 k. Ratification. Most Cited Cases
Former dealer's acceptance of payment for inventory repurchased by manufacturer at time of termination of dealership was not ratification of general release contained in termination agreement and did not preclude dealer's assertion of economic duress to invalidate release; although dealership agreement allegedly did not require manufacturer to repurchase inventory, dealer only received payment in exchange for return of inventory rather than as benefit from release.

**338 *834 ***862 Robert V. Ogren, Stratton,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)

Page 4

Dobbs & Nardulli, Springfield, for Bruce Carlile.

Steven M. Helm, Dukes, Martin, Helm & Ryan, Ltd., Danville, Lisa S. Mankofsky, Washington, DC, Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Snap-On-Tools, Inc.

Justice COOK delivered the opinion of the court:

Plaintiff Bruce Carlile's second-amended complaint against defendants Snap-on Tools (Snap-on) and Charles Johnson alleged fraudulent misrepresentation and breach of contract with respect to Carlile's employment as a Snap-on dealer. The trial court entered summary judgment for defendants based upon a written release executed by the parties. Carlile appeals, contending (1) the release was obtained in furtherance of a fraudulent scheme perpetrated by defendants and is therefore unenforceable; (2) the release was a general release which did not bar plaintiff's unsuspected claim; and (3) the release was obtained through duress. We reverse and remand.

For purposes of this appeal we must accept as true the facts set out in plaintiff's unrebutted affidavits. Plaintiff is a high school graduate whose work experience through June 1986 consisted of service-oriented**319 ***863 jobs, including retail sales manager and service manager of a Goodyear store and service writer at an Oldsmobile dealership. In 1986, he became interested in the possibility of becoming a Snap-on dealer after speaking with one of his fellow employees who was looking into a Snap-on dealership.

Snap-on is a Fortune 500 company and a manufacturer of hand tools sold to professional mechanics throughout the United States through a system of dealerships. Snap-on dealers buy tools and other products from Snap-on, then resell them to customers assigned each dealer by a "list of calls" covering that dealer's geographical area. *835 Defendant Johnson is a Snap-on field manager who contacted plaintiff and made certain representations to plaintiff concerning a possible Snap-on dealership.

Carlile had three initial meetings with Johnson. During the first meeting, Johnson repeatedly asked plaintiff about his assets and what kind of capital he could obtain to finance a dealership, which Johnson claimed would require an initial investment of $65,000. When Carlile asked questions about the location and size of the territory, Johnson said, "we don't need to get into that right now. We'll do that later." Johnson told Carlile he could make "big bucks" with Snap-on and stated a survey he was performing indicated there were 300 customers in the proposed territory who would buy Snap-on tools if a dealer came around.

Craig Seelman, a Snap-on sales manager, was present at the second and third meetings. Johnson and Seelman represented that within a year, plaintiff could be making what a doctor or lawyer would make, or between $100,000 and $150,000. Carlile was also told the dealership was his own business and he would be responsible for making business-related decisions. He would require 175 to 225 actual customers to support his dealership but Seelman reiterated there would in fact be 300 customers in Carlile's territory. Seelman told Carlile that Snap-on was a "risk-free" investment because if Carlile ever wanted to get out of his dealership, Snap-on would buy back all his inventory and write him a check for the full amount. Snap-on would also help Carlile transfer his outstanding credit accounts to a successor dealer for collection.

Before he decided to become a Snap-on dealer, Carlile went on three "dealer rides," during which the dealers drove to their customers' places of business, collected outstanding accounts, and made some sales. Johnson accompanied Carlile to Carlile's local bank to obtain a loan, where Johnson reiterated the "risk-free" nature of the dealership because of Snap-on's policy to buy back inventory. On July 1, 1986, Carlile traveled to St. Louis, where he leased a van, stocked it with inventory, and signed a dealer agreement and other documents setting forth his rights and obligations as a Snap-on dealer. A clause in the dealer agreement stated that it "supersedes all agreements to date between the parties and together with any written supplements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

Page 5

executed by both parties embodies all of the promises, undertakings, and obligations of the parties." The dealer agreement provided that if Carlile decided to terminate his dealership, he could, *with Snap-on's consent,* sell back to Snap-on any inventory in new and saleable condition at the price paid by Carlile.

Carlile was a Snap-on dealer for approximately 12 months. Three **\*836** months into his dealership, a series of mechanical problems with his rented van prevented him from working in his territory for a combined period of between three and four weeks. Within six months as a dealer, he began to run short of money. Johnson's solution was to tell Carlile to extend his credit, buy more inventory, and increase his collections. Carlile was assured he could succeed if he followed these "basics." Carlile discovered that his "list of calls" actually numbered between 140 and 145. He also discovered that he was not an independent businessman, because Snap-on regulated his hours and policies. Carlile and his wife had initially invested $58,500, including all their savings, in the dealership and incurred other expenses as a result of refinancing their home. They lost $100,000 as a result of their dealership venture, including most of their original $65,000 bank loan. They sold two vehicles and were forced to move into a smaller house. Carlile **\*\*320 \*\*\*864** stated, "by July 1987, I was facing personal financial ruin."

When Carlile decided to terminate his dealership, he drove his van to St. Louis and spent two days with Johnson checking in his inventory. During that time, Johnson never told Carlile he would be required to sign any documents before he could be reimbursed for his inventory. At the close of the second day, Carlile went with Johnson to Seelman's office. Seelman asked Johnson to leave the room. Seelman then presented Carlile with a form and instructed Carlile to write that the reason he was terminating his dealership was due to the mechanical problems he was having with his truck. Seelman then stated he could give Carlile a check for his re

turned inventory almost immediately, but it would take eight months or longer if Carlile did not write those words and sign the form. Carlile complied. The form, entitled "Termination Record," reads:

> "I am leaving due to ongoing problems with my truck. The expense for the transmission repairs, is to [*sic* ] much can not keep up with it. This problem deals with Gelco Vehicle Leasing Company. And not Snap-on Corp."

Carlile then read and signed a form entitled "Termination Agreement," which stated Snap-on agreed to pay Carlile for the return of his inventory at current dealer prices. The final paragraph of the termination agreement stated, in pertinent part:

> "[B]oth parties to this Agreement freely waive any and all claims they may have against each other arising out of the Dealership terminated by this Agreement. The dealer agrees that fair consideration has been given by the Company for this Agreement and fully understands this complete release of claims and the negotiated terms of this Agreement."

**\*837** Carlile received $21,970 for the inventory he returned to Snap-on. Snap-on held back an additional $2,314.80 of inventory proceeds to protect itself for credit (extended credit) which it had extended to Carlile's customers and which Carlile had guaranteed. Carlile turned in another $19,000 worth of outstanding accounts (revolving credit) for his successor dealer to collect. Carlile had personally extended the credit on those accounts and Snap-on had no exposure on them. Carlile would receive 75% of the collected accounts.

In addition to deposition transcripts and his affidavit, Carlile submitted the affidavit of Michael Jorgenson, a former 15-year employee of Snap-on. Facts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavits are admitted and must be taken as true for purposes of the motion. (*Purtill v. Hess* (1986), 111 Ill.2d 229, 240-41, 95 Ill.Dec.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

Page 6

305, 309-10, 489 N.E.2d 867, 871-72.) Jorgenson stated that he had been a manager of Snap-on in several western States and was familiar with Snap-on's national policies. Jorgenson had testified on behalf of several individuals in circumstances "very similar" to Carlile's. Snap-on's scheme involved recruiting dealers and cultivating a relationship of trust between the dealers and the field managers, then convincing the dealers to borrow substantial sums of money to finance a dealership. Snap-on's policy was to recruit new dealers by misrepresenting to them the income potential of a Snap-on dealership and the size of their territory, that the territory they would be servicing was equivalent to all other territories within the branch, that the investment in Snap-on was a risk-free proposition, and that the Snap-on dealership was an independent, sole proprietorship. Snap-on concealed information regarding dealer failure and turnover rates caused by inadequate territories. Field managers were specifically instructed to represent that a successful dealer could earn as much as doctors and lawyers, or up to $100,000 or more a year, in net profit before taxes.

According to Jorgenson, Snap-on's dealers sold tools under a revolving credit program in which dealers personally financed sales and bore the risk of nonpayment. Managers encouraged dealers to extend credit to everyone, even those whose applications for extended credit had been denied by Snap-on. The field managers would often encourage dealers to continue doing business and to continue extending their personal credit to customers, even though the managers knew the dealers would soon be replaced and have difficulty collecting those credit accounts.

**\*\*321 \*\*\*865** According to Jorgenson, Snap-on's policy was to insist that any dealer failure was due to that individual's personal deficiencies and not related to external factors, such as recessions, insufficient customers\*838 or territories. When Snap-on found potential replacements for failing dealers, it embarked upon a program of psychological pres-

sure and coercion designed to speed those dealers' exit from the company. Managers were instructed to tell a failing dealer that he was one of a very few dealers who had not succeeded and that he must not have been "cut out" for the business. Managers were also instructed to tell dealers that if they did not sign the termination agreement, they would not receive payment for their returned inventory and credit accounts, although Snap-on's policy was to buy back the inventory and collect on the credit accounts even if the dealer had not signed the agreement. Misrepresentations were made to dealers to obtain their signatures on termination agreements primarily because the termination agreement contained a release of all claims. Snap-on did not explain to the branch managers the legal effect of each clause of the termination agreement. If any clause was questioned by the dealer, Jorgenson had been instructed to simply insist that the dealer sign the termination agreement.

Summary judgment should be granted only where the pleadings, depositions, affidavits, and admissions on file show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. (*Purtill,* 111 Ill.2d at 240, 95 Ill.Dec. at 309, 489 N.E.2d at 871.) In reviewing an order granting summary judgment, this court conducts a *de novo* review of the evidence. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill.2d 90, 102, 180 Ill.Dec. 691, 696, 607 N.E.2d 1204, 1209.

[1] There are competing policies regarding releases of claims. Public policy favors the settlement of claims, and it is important that claims, once fairly resolved, not be resurrected. On the other hand, releases should not be used as instruments of fraud or oppression. See *Antal v. Taylor* (1986), 146 Ill.App.3d 863, 866-67, 100 Ill.Dec. 327, 329, 497 N.E.2d 305, 307.

[2] It is sometimes said that a release is a contract, and the same rules which apply to other contracts (particularly the parol evidence rule) apply to releases. It appears, however, that the courts are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)

Page 7

much more careful in applying the parol evidence rule to releases than they are to other contracts. The intention of the parties controls the scope and effect of a release, and this intent "is discerned from the language used *and the circumstances of the transaction.*" (Emphasis added.) (*Carona v. Illinois Central Gulf R.R. Co.* (1990), 203 Ill.App.3d 947, 951, 148 Ill.Dec. 933, 936, 561 N.E.2d 239, 242.) A release cannot be construed to include claims not within the contemplation of the parties. (*Carona,* 203 Ill.App.3d at 951, 148 Ill.Dec. at 936, 561 N.E.2d at 242; see **839***Clear-Vu Packaging, Inc. v. National Union Fire Insurance Co.* (1982), 105 Ill.App.3d 671, 674, 61 Ill.Dec. 212, 214-15, 434 N.E.2d 365, 367-68.) "[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Ainsworth Corp. v. Cenco, Inc.* (1982), 107 Ill.App.3d 435, 439, 63 Ill.Dec. 168, 172, 437 N.E.2d 817, 821.

[3] Where there are words of general release in addition to recitals of specific claims, the words of general release are limited to the particular claim to which reference is made. (*Carona,* 203 Ill.App.3d at 951, 148 Ill.Dec. at 936, 561 N.E.2d at 242.) Where there are only words of general release, the courts will restrict the release to the thing or things intended to be released and will refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties. (*Gladinus v. Laughlin* (1977), 51 Ill.App.3d 694, 696, 9 Ill.Dec. 173, 175, 366 N.E.2d 430, 432; *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center* (1985), 137 Ill.App.3d 294, 304, 92 Ill.Dec. 110, 116, 484 N.E.2d 841, 847.) A general release is inapplicable to an unknown claim. *Farm Credit Bank v. Whitlock* (1991), 144 Ill.2d 440, 448, 163 Ill.Dec. 510, 513, 581 N.E.2d 664, 667.

**\*\*322 \*\*\*866** [4] Even where the parties intend to release a specific claim, the release of that claim will not be enforced if there has been fraud, duress,

mutual mistake, or, at least in some cases, unconscionability. *Rudolph v. Santa Fe Park Enterprises, Inc.* (1984), 122 Ill.App.3d 372, 374, 78 Ill.Dec. 38, 40, 461 N.E.2d 622, 624 (fraud in execution or inducement); *Alexander v. Standard Oil Co.* (1981), 97 Ill.App.3d 809, 814-15, 53 Ill.Dec. 194, 198, 423 N.E.2d 578, 582, citing *Kaplan v. Kaplan* (1962), 25 Ill.2d 181, 186, 182 N.E.2d 706, 709 (duress); *Rakowski v. Lucente* (1984), 104 Ill.2d 317, 324, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (mutual mistake); *Simmons v. Blauw* (1994), 263 Ill.App.3d 829, 834, 200 Ill.Dec. 262, 266, 635 N.E.2d 601, 605 (unconscionable release of personal injury claim).

Carlile first contends the release did not include a claim for fraud, as that claim was not in the minds of the parties when they signed the release. In deposition testimony, Carlile stated he never considered suing Snap-on while he was still a dealer. When Carlile decided to end his dealership, he did, as defendants contend, realize that (1) his territory did not have the 175 to 225 customers necessary to support a dealership, much less the 300 promised by Johnson; (2) he had not come anywhere close to making the $100,000 to $150,000 figure presented by Johnson; and (3) all aspects of his dealership were regulated by Snap-on and he was, therefore, not a sole proprietor. Carlile testified, however, that when he was signing the termination record and termination agreement, he felt he was a failure, because this was the message Snap-on had drummed into his head. He also noted he was thinking about his bank loans and feeling pressured**\*840** by Seelman when he signed the agreements. No evidence indicates plaintiff was aware of a legal fraud claim when he signed the release.

[5] The appropriate inquiry is not whether Carlile could or should have been able to discover his fraud claim. The question rather is whether that claim was a claim which the parties intended to release when they signed the release document. There was no discussion between the parties of any fraud claim. The only obligation of Snap-on to Carlile

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)

which was discussed was the payment for inventory, and the amount paid Carlile pursuant to the termination agreement was measured exactly by the value of that inventory. The words of general release here should not be interpreted to defeat a claim for fraud which was not in the minds of the parties, certainly not in the mind of Carlile.

[6][7][8][9] A genuine issue of material fact also exists whether Carlile was subjected to economic duress when he signed the release. Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances depriving him of the exercise of free will. (*Alexander,* 97 Ill.App.3d at 814, 53 Ill.Dec. at 198, 423 N.E.2d at 582.) Acts or threats cannot constitute duress unless they are wrongful, but the term "wrongful" extends to acts that are wrongful in a moral sense, as well as acts which are criminal, tortious, or in violation of contract duty. (*Alexander,* 97 Ill.App.3d at 815, 53 Ill.Dec. at 198, 423 N.E.2d at 582.) Duress cannot be predicated upon a demand which is lawful or upon one's doing or threatening to do that which one has a legal right to do, such as filing a justifiable statutory lien. (*Butler v. Metz, Train, Olson & Youngren, Inc.* (1978), 62 Ill.App.3d 424, 430, 20 Ill.Dec. 187, 192, 379 N.E.2d 1255, 1260.) Nor does the defense of duress exist where consent to an agreement is secured because of mere hard bargaining or the pressure of financial circumstances. Rather, the conduct of the party obtaining the advantage must be manifestly tainted with some degree of fraud or wrongdoing in order to invalidate an agreement on the basis of duress. *Alexander,* 97 Ill.App.3d at 815, 53 Ill.Dec. at 198-99, 423 N.E.2d at 582-83.

[10] Snap-on argues that in pressuring Carlile to sign the termination agreement it did not threaten to do anything it did not have a right do so. Snap-on contends that under the terms of the dealer agreement it had no obligation to repurchase inventory without its "consent" to do so. Even assuming that is true, there is at least a question of fact whether Snap-on consented here. Snap-on told Carlile to bring his inventory to St. Louis and turn it in, and that Snap-on would repurchase it; Carlile did turn in, and Snap-**323 ***867 on accepted, that inventory. Snap-on had no right to refuse to pay Carlile for his inventory,*841 and accordingly, no right to threaten not to make that payment.

Snap-on argues that under the dealer agreement it had the right to apply Carlile's inventory proceeds to amounts owed Snap-on "arising from the purchase of Products, the assignment of open accounts with recourse, or other business activities of the Dealer, as such liabilities shall be finally determined by [Snap-on]." However, for purposes of the motion, it would appear Carlile did not owe Snap-on anything for the purchase of products. Carlile was obligated to Snap-on as the guarantor on some accounts where Snap-on had extended credit to customers, but Snap-on deducted that money from the inventory proceeds it paid Carlile. The record of dealer termination signed by Snap-on's branch manager at the time of termination states that Carlile owed Snap-on nothing.

Professors White and Summers describe an individual who refuses to perform his contract duties unless he receives a concession as an extortionist. They note that, under the Uniform Commercial Code (Code) (see 810 ILCS 5/1-101*et seq.* (West 1992)), such concessions may be avoided by showing that they are in bad faith or unconscionable. They note that in non-Code cases the consideration doctrine could be used to police against extortion: " 'You gave no new consideration for the concession and you had a preexisting duty to do everything you are to do under the modified arrangement, hence the concession is unenforceable.' " (J. White & R. Summers, Uniform Commercial Code § 1-5, at 47 (2d ed. 1980).) (Under the Code, an agreement modifying a sales contract needs no consideration to be binding. (810 ILCS 5/2-209(1) (West 1992)).) *Cf. Wilson v. Hoffman Group, Inc.* (1989), 131 Ill.2d 308, 321, 137 Ill.Dec. 579, 585, 546 N.E.2d 524, 530 (any detriment or benefit can constitute consideration).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

Page 9

[11] In addition to his own statements, Carlile submitted the affidavit of Jorgenson stating defendants developed a fraudulent scheme to systematically bilk Snap-on dealers of their efforts and capital and, once the dealers were no longer financially viable, Snap-on managers pressured the dealers to sign termination agreements before Snap-on would buy back the dealers' remaining inventory. Fraud, even in the inducement, may justify consideration of prior understandings which would be otherwise excluded under the parol evidence rule. (*Farm Credit Bank v. Isringhausen* (1991), 210 Ill.App.3d 724, 728, 155 Ill.Dec. 235, 237-38, 569 N.E.2d 235, 237-38.) Taking all of plaintiff's allegations as true, as we must on review of a summary judgment motion, we find that plaintiff has alleged sufficient facts to create a question whether defendants' conduct was "tainted with some degree of fraud or wrongdoing." *Alexander,* 97 Ill.App.3d at 815, 53 Ill.Dec. at 199, 423 N.E.2d at 583.

**\*842** [12] When a party has had ample time for inquiry, examination and reflection, it is less likely that his will has been overcome by economic duress. (*Alexander,* 97 Ill.App.3d at 816, 53 Ill.Dec. at 199, 423 N.E.2d at 583, citing *Hyde v. Lewis* (1975), 25 Ill.App.3d 495, 502, 323 N.E.2d 533, 538.) Moreover, where a plaintiff is aware of the claims he has waived and has had an opportunity to consult with an attorney, it is easier to rebut claims of economic duress. (See, *e.g., Seward v. B.O.C. Division of General Motors Corp.* (N.D.Ill.1992), 805 F.Supp. 623, 629 (plaintiff a college graduate with significant management experience and a registered real estate agent); *Kewanee Production Credit Association v. G. Larson & Sons Farms, Inc.* (1986), 146 Ill.App.3d 301, 306, 99 Ill.Dec. 838, 841, 496 N.E.2d 531, 534 (plaintiffs had discussed legal options with counsel in open court); *Alexander,* 97 Ill.App.3d at 816, 53 Ill.Dec. at 199, 423 N.E.2d at 583 (plaintiffs aware of claims they waived and consulted with attorney before signing).) The existence of duress generally is one of fact, to be determined in light of all the circumstances surrounding a given transaction.

*Schlossberg v. E.L. Trendel & Associates, Inc.* (1978), 63 Ill.App.3d 939, 943-44, 20 Ill.Dec. 741, 745, 380 N.E.2d 950, 954.

There is at least a question of fact whether any of the circumstances mentioned were present in the instant case. Carlile was not told he would have to sign anything as a condition to receiving reimbursement for his **\*\*324 \*\*\*868** inventory until the close of the second day of the inventory return, when Seelman sent Johnson out of his office and presented Carlile with papers to sign. Seelman instructed Carlile to complete and sign the termination record, noting that Carlile would be quickly reimbursed only if he completed the form as Seelman had suggested, and then handed over the termination agreement to be signed. Carlile was experiencing severe marital difficulties and was facing "personal financial ruin." Given these facts, we hold the trial court erred as a matter of law in granting defendants' motion for summary judgment on the basis that the release was binding.

[13][14] Defendants argue that even if Carlile has alleged sufficient facts to create a genuine issue of material fact as to the effectiveness of the release, Carlile's acceptance of $21,970 from his returned inventory constituted a ratification of the release. A victim of duress who accepts the benefits flowing from the contract for any considerable length of time ratifies the contract. (*Mellor v. Budget Advisors, Inc.* (7th Cir.1969), 415 F.2d 1218, 1220-21.) Because the dealer agreement supposedly did not obligate defendants to reimburse Carlile for his inventory, defendants contend the $21,970 payment for that inventory was a benefit flowing from the release. Carlile, however, received the money because he returned his inventory, not because he signed the release. The cases defendants cite are inapposite to the present situation. In *Seward* and *Mellor,* the plaintiffs signed termination agreements under which they received substantial monthly payments; plaintiffs continued to accept the monthly payments even after they sued on the termination agreements and alleged duress. (*Seward,* 805

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

648 N.E.2d 317
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861
**(Cite as: 271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861)**

Page 10

F.Supp. at 632-33; *Mellor,* 415 F.2d at 1220.) Carlile was not the recipient of any such continuing "severance" benefits. His situation differs markedly from that of the plaintiffs in *Seward* and *Mellor,* and we are unwilling to extend the doctrine of ratification to the factual scenario at hand.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is reversed and remanded for further proceedings not inconsistent with this order.

Reversed and remanded.

KNECHT, P.J., and McCULLOUGH, J., concur.
Ill.App. 4 Dist.,1995.
Carlile v. Snap-on Tools
271 Ill.App.3d 833, 648 N.E.2d 317, 207 Ill.Dec. 861

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

670 N.E.2d 822
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
**(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)**

**C**
Gavery v. McMahon & Elliott
Ill.App. 1 Dist.,1996.

Appellate Court of Illinois,First District, Second
Division.
G. Raymond GAVERY, Plaintiff-Appellant,
v.
McMAHON & ELLIOTT, Defendant-Appellee,
andRooks, Pitts & Poust, and David J. Pritchard,
Defendants.
**No. 1-95-3476.**

Sept. 17, 1996.

After physician was required to settle his claim
against purchaser of his medical practice due to
conflict between noncompetition agreement in pur-
chase agreement and provisions of Illinois Medical
Practice Act, physician brought legal malpractice
action against law firm that represented him in con-
nection with sale agreement and accompanying
noncompetition agreement. Plaintiff alleged that
defendant breached its contract for legal services by
failing to advise plaintiff that noncompetition
agreement might be in violation of Act. The Circuit
Court, Cook County, Kathy M. Flanagan, J., gran-
ted defendant's motion to dismiss based upon re-
lease by which defendant agreed to cooperate with
plaintiff in dispute with purchaser in return for
plaintiff's waiver of all claims against defendant
resulting from sale. Plaintiff appealed. The Appel-
late Court, Hartman, P.J., held that: (1) release ap-
plied to plaintiff's claim, and (2) release was sup-
ported by adequate consideration.

Affirmed.

West Headnotes

**[1] Pretrial Procedure 307A ⊂⇒624**

307A Pretrial Procedure
  307AIII Dismissal
    307AIII(B) Involuntary Dismissal

      307AIII(B)4 Pleading, Defects In, in Gen-
eral
        307Ak623 Clear and Certain Nature of
Insufficiency
        307Ak624 k. Availability of Relief
Under Any State of Facts Provable. Most Cited Cases
Dismissal on pleadings is warranted only where it
is clearly apparent that no set of facts can be proved
that would entitle plaintiff to recover. S.H.A. 735
ILCS 5/2-619.

**[2] Pretrial Procedure 307A ⊂⇒687**

307A Pretrial Procedure
  307AIII Dismissal
    307AIII(B) Involuntary Dismissal
      307AIII(B)6 Proceedings and Effect
        307Ak686 Matters Deemed Admitted
        307Ak687 k. Well-Pleaded Facts.
Most Cited Cases
Motion to dismiss on pleadings admits all well-
pleaded facts. S.H.A. 735 ILCS 5/2-619.

**[3] Release 331 ⊂⇒25**

331 Release
  331II Construction and Operation
    331k25 k. General Rules of Construction.
Most Cited Cases

**Release 331 ⊂⇒58(1)**

331 Release
  331III Proceedings to Establish Release
    331k58 Questions for Jury
      331k58(1) k. In General. Most Cited Cases
Releases are governed by contract law; thus,
parties' intention must be determined from instru-
ment itself, and construction of instrument, where
no ambiguity exists, is matter of law.

**[4] Evidence 157 ⊂⇒448**

670 N.E.2d 822

Page 2

283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
**(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(D) Construction or Application of Language of Written Instrument
       157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases

**Release 331 ⇒58(1)**

331 Release
   331III Proceedings to Establish Release
     331k58 Questions for Jury
       331k58(1) k. In General. Most Cited Cases
Construction of ambiguous release is question of fact and parol evidence is admissible to explain what parties intended.

**[5] Release 331 ⇒30**

331 Release
   331II Construction and Operation
     331k30 k. Scope and Extent in General. Most Cited Cases

**Release 331 ⇒31**

331 Release
   331II Construction and Operation
     331k31 k. General Release. Most Cited Cases
Where releasing party was unaware of claims other than those contemplated by release, it will be limited to specific claims contained in release agreement; where both parties were aware of additional claim at time of signing release, however, general release language of agreement will be given effect to release that claim as well.

**[6] Release 331 ⇒30**

331 Release
   331II Construction and Operation
     331k30 k. Scope and Extent in General. Most Cited Cases
Client's release in favor of law firm that represented client in sale of his medical practice precluded cli-

ent's subsequent claim that firm breached its contract for legal services by failing to advise client that noncompetition agreement might be in violation of Illinois Medical Practice Act; despite client's claim that he knew about only one claim against firm, which related to dispute with purchaser regarding whether credits were to be applied against purchase price, release stated that client waived all claims arising from sale of assets and good will of his practice, "including but without limitation, any injury or damage sustained by [client] by virtue of entering into" asset purchase agreement and/or noncompetition agreement. S.H.A. 225 ILCS 60/1 et seq.

**[7] Evidence 157 ⇒448**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(D) Construction or Application of Language of Written Instrument
       157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
Parol evidence is admissible only where court determines that contract is ambiguous.

**[8] Release 331 ⇒12(1)**

331 Release
   331I Requisites and Validity
     331k11 Consideration
      331k12 Necessity and Nature
       331k12(1) k. In General. Most Cited Cases
Release must be based upon consideration which consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by other.

**[9] Contracts 95 ⇒75(1)**

95 Contracts
   95I Requisites and Validity
     95I(D) Consideration

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

670 N.E.2d 822
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
**(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)**

*95k75 Performance of Legal Obligation*
        *95k75(1) k. In General. Most Cited Cases*
"Preexisting duty rule" provides that where one contracting party does what it is already legally obligated to do, there is no consideration because there is no detriment.

**[10] Release 331 ☞13(1)**

331 Release
    331I Requisites and Validity
        331k11 Consideration
            331k13 Sufficiency in General
                331k13(1) k. In General. Most Cited Cases
Law firm that represented client in sale of his medical practice had no "preexisting duty" to cooperate with client in subsequent dispute between client and purchaser regarding purchase price, and thus, firm's agreement to cooperate with client without further charge if client released firm from any claims that he might have against firm was sufficient "consideration" for that release; attorney-client relationship had terminated, as firm had completed negotiation and sale of client's business prior to client's retention of independent counsel, and firm was not client's "fiduciary" when release was executed, as independent counsel had informed client that he might have cause of action against firm, at which point firm and client had opposing interests. Sup.Ct.Rules, Rule 134; Rules of Prof.Conduct, Rule 1.7.

**[11] Contracts 95 ☞53**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k53 k. Adequacy. Most Cited Cases
Court's inquiry into whether contract is supported by consideration does not extend to examining adequacy of consideration.

**[12] Contracts 95 ☞53**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k53 k. Adequacy. Most Cited Cases
It is not court's function to review amount of consideration unless amount is so grossly inadequate as to shock court's conscience.

**[13] Contracts 95 ☞53**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k53 k. Adequacy. Most Cited Cases
Mere inadequacy of consideration, in absence of fraud or unconscionable advantage, ordinarily is insufficient to justify setting aside contract.

**[14] Release 331 ☞13(1)**

331 Release
    331I Requisites and Validity
        331k11 Consideration
            331k13 Sufficiency in General
                331k13(1) k. In General. Most Cited Cases
Law firm's agreement to cooperate with former client in his dispute arising from sale of his medical practice, during which firm represented client, was sufficient consideration for client's release of firm from all claims arising from that representation; client was advised by independent counsel in relation to release and was informed that he might have claims against firm arising from purchase agreement and accompanying noncompetition agreement, and client did not allege fraud or unconscionable advantage.

**823 *485 ***145 Campbell & DiVincenzo, Chicago (Anthony S. DiVincenzo, of counsel), for Appellant.
Alholm and Monahan, Chicago (Peter A. Monahan, Mark A. Kuchler and Patricia M. Noonan, of counsel), for Appellee.
Presiding Justice HARTMAN delivered the opinion of the court:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff G. Raymond Gavery appeals from the circuit court's order granting defendant McMahon & Elliott's motion to dismiss based **824 ***146 upon a release claiming error in the court's failure to find that the release excluded Gavery's instant claim against defendant and was unsupported by consideration. Only defendant McMahon & Elliott is involved in this appeal.

On April 5, 1989, Gavery, a physician, entered into an asset purchase agreement (Purchase Agreement) and a non-competition agreement (collectively Agreements) with Primary Care Family Center (PCFC) in which PCFC purchased his medical practice and Gavery agreed not to compete with PCFC in exchange for 10% of PCFC's gross cash revenue over a 10-year period. Gavery was represented by McMahon & Elliott (hereinafter defendant), a law firm, in connection with the Agreements.

In March of 1990, a dispute arose between PCFC and Gavery regarding whether certain credits were to be applied against the purchase price. Gavery was then represented by Rooks, Pitts & Poust in relation to this dispute. Defendant refused to cooperate with Rooks, Pitts & Poust unless Gavery released defendant from any claims he might have against it.

**\*486** Rooks, Pitts & Poust advised Gavery he might have "certain claims" against defendant for failing to counsel him properly regarding the draft of the Purchase Agreement. According to Gavery, the only claim discussed with defendant was the claim relating to the credits and neither Rooks, Pitts & Poust nor defendant advised Gavery that he "might have a claim against [defendant] for the failure to properly structure the sale to comply with The Illinois Medical Practice Act." In order to secure defendant's cooperation, Gavery executed a release.

In May of 1993, PCFC filed an action for declaratory relief, seeking to void the non-competition agreement as violative of the Medical Practice Act of 1987 (the Act). 225 ILCS 60/1 *et seq.* (West

1992). Due to the conflict between the non-competition agreement and the Act, Gavery had to settle his claim.

Gavery thereafter filed this action, contending: (1) defendant and Rooks, Pitts & Poust breached their contracts for legal services in failing to advise him properly about the validity of the non-competition agreement; and (2) defendant and Rooks, Pitts & Poust were negligent in failing to advise him that the non-competition agreement may be in violation of the Act. Gavery subsequently filed an amended complaint adding another count of negligence against Rooks, Pitts & Poust for failing to inform him of the full extent of his claims against defendant. Defendant subsequently filed a section 2-619 motion (735 ILCS 5/2-619 (West 1994) (section 2-619)) to dismiss Gavery's amended complaint, arguing the release barred the claims. Gavery's response to the motion, supported by his affidavit, claimed that he knew about only one claim against defendant, which related to the dispute with PCFC regarding whether credits were to be applied against the purchase price. The circuit court granted defendant's motion to dismiss, noting that the release was very specific and unambiguous. Gavery appeals.

I

Gavery initially contends the circuit court erred in granting defendant's motion to dismiss because the release does not apply to claims not contemplated by the parties.

[1][2] Section 2-619 provides a mechanism to dispose of issues of law or easily proved issues of fact. *Glassie v. Papergraphics, Inc.,* 248 Ill.App.3d 621, 624, 188 Ill.Dec. 315, 618 N.E.2d 885 (1993). A dismissal on the pleadings is warranted only where it is clearly apparent that no set of facts can be proved which would entitle plaintiff to recover. *Wood v. Village of Grayslake,* 229 Ill.App.3d 343, 170 Ill.Dec. 590, 593 N.E.2d 132 (1992). A motion brought under this section admits all well pleaded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

670 N.E.2d 822
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)

Page 5

facts. *Geick v. Kay,* 236 Ill.App.3d 868, 873, 177 Ill.Dec. 340, 603 N.E.2d 121 (1992).

**\*487** [3][4] Releases are governed by contract law; accordingly, the intention of the parties to a release must be determined from the instrument itself, and construction of the instrument, where no ambiguity exists is a matter of law. *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 447, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991)(*Whitlock* ). The construction of an ambiguous release is a question of **\*\*825 \*\*\*147** fact and parol evidence is admissible to explain what the parties intended. *Whitlock,* 144 Ill.2d at 447, 163 Ill.Dec. 510, 581 N.E.2d 664.

[5] Where the releasing party was unaware of claims other than those contemplated by the release, it will be limited to the specific claims contained in the release agreement. *Whitlock,* 144 Ill.2d at 447, 163 Ill.Dec. 510, 581 N.E.2d 664. Where both parties were aware of an additional claim at the time of signing the release, however, the general release language of the agreement will be given effect to release that claim as well. *Whitlock,* 144 Ill.2d at 447, 163 Ill.Dec. 510, 581 N.E.2d 664.

[6] Gavery submits a release cannot be construed to apply to claims not in the contemplation of the parties at the time the release was executed. The recitals of the instant release, however, specifically provide that: defendant "represented Gavery, among other matters, in connection with" the sale of his business; defendant negotiated the Purchase Agreement and the non-competition agreement; PCFC made payments to Gavery but Gavery believed the amounts of the payments were incorrect; Gavery was advised by Rooks, Pitts & Poust that he "may have causes of action against [defendant] as a result of Gavery's signing the Agreements"; defendant informed Rooks, Pitts & Poust "there may be a conflict between [defendant] and Gavery regarding the sale of Primary Care"; and, Gavery "consulted with Rooks, Pitts and Poust regarding the potential cause of action he may have against [defendant]." The release further states Gavery waives all claims "as a result of the sale of the assets and goodwill of Primary Care, *including but without limitation, any injury or damage sustained by Gavery by virtue of entering into the Asset Purchase Agreement and/or the Non-Competition Agreement.*" (Emphasis added.) The release agreement is very specific and unambiguous: Gavery was advised by Rooks, Pitts & Poust he may have claims against defendant arising out of the Agreements. Gavery waived all claims against defendant concerning the Agreements. Accordingly, the release bars Gavery's claims.

Gavery argues he intended only to waive his claim relating to the credit arrangement under the Purchase Agreement and that a party cannot waive a claim it is unaware of, relying upon *Whitlock,* 144 Ill.2d at 447-48, 163 Ill.Dec. 510, 581 N.E.2d 664, and *Myers v. Health Specialists, S.C.,* 225 Ill.App.3d 68, 167 Ill.Dec. 225, 587 N.E.2d 494 (1992). Those cases are distinguishable from the **\*488** present case, however, because they involve either ambiguous or general releases.

Gavery contends *Carlile v. Snap-On Tools,* 271 Ill.App.3d 833, 207 Ill.Dec. 861, 648 N.E.2d 317 (1995)(*Carlile* ), is analogous to the present case. In *Carlile,* plaintiff wanted to terminate his Snap-on tools dealership. In order to terminate his dealership and be reimbursed for inventory immediately, plaintiff was instructed to sign a form after explaining that the termination was not caused by Snap-on Tools Corporation. 271 Ill.App.3d at 836, 207 Ill.Dec. 861, 648 N.E.2d 317. Plaintiff was also required to sign a "Termination Agreement," which provided that Snap-on would pay him "for the return of his inventory at current dealer prices." 271 Ill.App.3d at 836, 207 Ill.Dec. 861, 648 N.E.2d 317. The final paragraph of the termination agreement contained a release provision which stated that both parties to the agreement "waive any and all claims they may have against each other arising out of the [Snap-on] Dealership terminated by this Agreement." 271 Ill.App.3d at 836, 207 Ill.Dec. 861, 648 N.E.2d 317. The *Carlile* court reversed the trial court's grant of summary judgment for defendants finding that the words of general release in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the termination agreement applied only to the inventory. 271 Ill.App.3d at 840, 207 Ill.Dec. 861, 648 N.E.2d 317. There was no evidence there to indicate "plaintiff was aware of a legal fraud claim when he signed the release," and a question of fact remained as to whether defendants' conduct was fraudulent. 271 Ill.App.3d at 840, 207 Ill.Dec. 861, 648 N.E.2d 317.

The release in the present case is readily distinguishable from the extremely broad and sweeping release in *Carlile*. The release in *Carlile*, unlike the release in the instant case, contained no recitals setting forth the **826 ***148 facts upon which the release was based. Although plaintiff in *Carlile* read the termination agreement prior to signing, it mainly dealt with Snap-on's promise to pay for returned inventory at current dealer prices and only the last paragraph addressed the release of claims. 271 Ill.App.3d at 836, 207 Ill.Dec. 861, 648 N.E.2d 317. Unlike Gavery, obviously a sophisticated businessman and physician, plaintiff in *Carlile* was a high school graduate who was unrepresented by counsel. 271 Ill.App.3d at 835, 207 Ill.Dec. 861, 648 N.E.2d 317. The *Carlile* court also noted that plaintiff may have been pressured by Snap-on to sign the termination agreement. Consequently, the court in *Carlile* reversed and remanded, in part, because plaintiff's claim of duress raised a question of fact. *Carlile*, therefore, contains many circumstances, including, most significantly, a vague and broadly sweeping release provision, which differ substantially from the present case. Accordingly, Gavery's contention must be rejected.

[7] Gavery also argues that there are issues of fact concerning the scope of the release because his specific malpractice claims were not within the contemplation of the parties when they executed the *489 release, relying upon his uncontradicted affidavit. Parol evidence, however, is admissible *only* where a court determines that a contract is ambiguous. (Emphasis added.) *Whitlock*, 144 Ill.2d at 447, 163 Ill.Dec. 510, 581 N.E.2d 664. The release in the present case unambiguously applies to the Pur-

chase Agreement and the non-competition agreement. Gavery, who was advised by independent counsel regarding the release, specifically released his claims relating to the Agreements. The circuit court properly dismissed his complaint.

II

Gavery next asserts the circuit court erred in dismissing his complaint because the release was unsupported by consideration or, alternatively, the consideration was inadequate.

A

[8][9] A release must be based upon consideration which consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other. *White v. Village of Homewood*, 256 Ill.App.3d 354, 356-57, 195 Ill.Dec. 152, 628 N.E.2d 616 (1993). The preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration because there is no detriment. *White*, 256 Ill.App.3d at 357, 195 Ill.Dec. 152, 628 N.E.2d 616.

[10] The release agreement states that Gavery may have a cause of action against defendant; defendant agrees "to cooperate without further charge," provided that Gavery release defendant from claims he may have; and defendant agrees "to release any claims it may have or believe it has against Gavery." Despite this explicit language, Gavery contends there was no consideration because defendant, as Gavery's former counsel, was legally and ethically required to cooperate with him. Gavery reasons these alleged legal and ethical obligations created a preexisting duty. Gavery's argument is based on the attorney-client relationship. The attorney-client relationship terminates, however, when the matter for which the attorney has been retained is completed. See *Herbster v. North American Co. for Life & Health Insurance*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

670 N.E.2d 822
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)

Page 7

150 Ill.App.3d 21, 28, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986).

The release provides that defendant was Gavery's "former counsel." Gavery asserts for the first time in his reply brief that a question of fact exists as to whether the attorney-client relationship was terminated. Failure to raise an issue in an opening brief results in a waiver of that issue. See *People v. Williams,* 200 Ill.App.3d 503, 513, 146 Ill.Dec. 298, 558 N.E.2d 261 (1990); Official Reports Advance Sheet No. 26 (Dec. 22, 1993), R. 341(e)(7), eff. Feb. 1, 1994. Gavery has waived this issue.

**\*490** Waiver aside, the record demonstrates that defendant had completed the negotiation and sale of Gavery's business prior to Gavery's retention of Rooks, Pitts & Poust. Gavery thereafter considered pursuing legal action against defendant. Gavery acknowledges in his affidavit that in his dispute with **\*\*827 \*\*\*149** PCFC, he needed the help of defendant, his counsel "at the time of the sale." The matter for which defendant was retained was completed and Gavery regarded defendant as his former counsel. Accordingly, the attorney-client relationship was terminated.

The record also reveals that defendant was not Gavery's fiduciary at the time the release was executed. See generally *State Security Insurance Co. v. Frank B. Hall & Co.,* 258 Ill.App.3d 588, 595, 196 Ill.Dec. 775, 630 N.E.2d 940 (1994). Gavery had retained independent counsel to represent him in his dispute with PCFC and was informed by independent counsel that he "may have causes of action against" defendant. Gavery and defendant then had opposing interests. Consequently, no fiduciary relationship existed. See *Weisblatt v. Colky,* 265 Ill.App.3d 622, 625-26, 202 Ill.Dec. 462, 637 N.E.2d 1198 (1994); see also Article VIII, Illinois Rules of Professional Conduct, 134Ill.2d R. 1.7.

Notwithstanding the alleged existence of any legal or ethical obligations, defendant agreed "to release *any claims* it may have or believe it has against Gavery." (Emphasis added.) Gavery argues defend-

ant never waived its claim for legal fees because legal fees were never discussed in the release. Gavery, however, owed fees to defendant when the release was executed. Defendant released "any claims," which could have included its claim for Gavery's fees and, therefore, relinquished a right. Defendant also agreed to cooperate "without further charge to Gavery in pursuit of his remedies." By these promises, defendant forewent a right and undertook an obligation. The release was supported by consideration.

B

Gavery alternatively contends the amount of consideration was inadequate to support the release and indicates that the parties did not contemplate a release of the claims made in this case.

[11][12][13] A court's inquiry into whether a contract is supported by consideration does not extend to examining the adequacy of the consideration. *Goodwine State Bank v. Mullins,* 253 Ill.App.3d 980, 1011, 192 Ill.Dec. 901, 625 N.E.2d 1056 (1993). It is not a court's function to review the amount of consideration unless the amount is so grossly inadequate as to shock the conscience of the court. *Bonner v. Westbound Records, Inc.,* 76 Ill.App.3d 736, 743, 31 Ill.Dec. 926, 394 N.E.2d 1303 (1979). Mere inadequacy of consideration, in the absence of fraud or unconscionable **\*491** advantage, ordinarily is insufficient to justify setting aside a contract. *Mullins,* 253 Ill.App.3d at 1011, 192 Ill.Dec. 901, 625 N.E.2d 1056.

[14] Gavery was advised by independent counsel in relation to the release and he was informed that he might have claims against defendant arising from the Purchase Agreement and the non-competition agreement. Gavery has not alleged fraud or unconscionable advantage and the record shows none. The consideration was not so insufficient as to shock the conscience of the court.

For the foregoing reasons, the order of the circuit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

670 N.E.2d 822
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144
**(Cite as: 283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144)**

Page 8

court is affirmed.

Affirmed.

SCARIANO and DiVITO, JJ., concur.
Ill.App. 1 Dist.,1996.
Gavery v. McMahon & Elliott
283 Ill.App.3d 484, 670 N.E.2d 822, 219 Ill.Dec. 144

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 1

**H**
Hickox v. Bell
Ill.App. 5 Dist.,1990.

Appellate Court of Illinois,Fifth District.
Wayne HICKOX and Lucille Hickox, Plaintiffs-Appellees, Counterdefendants-Cross-Appellants,
v.
Billy V. BELL and Barbara Joan Bell, Defendants-Appellants, Counterplaintiffs-Cross-Appellees (Indiana National Bank, Defendant-Cross-Appellee).
No. 5-87-0648.

March 16, 1990.

Vendors brought action against purchasers and assignee bank alleging that vendors were not in default of contract. Counterclaim was filed by purchasers. The Circuit Court, Wayne County, Donald Garrison, J., entered judgment. Appeal and cross appeal were taken. The Appellate Court, Chapman, J., held that: (1) liquidated damages clause in contract was unenforceable; (2) purchasers could be credited with initial $50,000 paid under contract for purposes of determining whether purchasers paid enough of principal to be entitled to conveyance of realty demanded; and (3) vendors breached contract by failing to turn over warranty deeds upon payment of sufficient amount of principal.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Vendor and Purchaser 400 ⟡179**

400 Vendor and Purchaser
    400IV Performance of Contract
        400IV(D) Payment of Purchase Money
            400k178 Mode and Sufficiency of Payment
                400k179 k. In General. Most Cited Cases
As right to assignment of real estate contract was clearly provided for in agreement and since validity of assignment and reassignment of contract between purchasers and subsequent purchasers was not contested at trial, money paid by subsequent purchasers under contract was to be credited against purchasers as payment under the contract, for purposes of determining whether purchasers paid sufficient amount of principal to entitle them to conveyance of realty demanded.

**[2] Damages 115 ⟡79(5)**

115 Damages
    115IV Liquidated Damages and Penalties
        115k75 Construction of Stipulations
            115k79 Certainty as to Amount of Actual Damage
                115k79(5) k. Breach of Contract of Sale or Lease. Most Cited Cases
Liquidated damages clause in real estate sales contract, which provided that vendors could declare agreement forfeited and terminated and could reenter possession of land and retain all monies paid thereunder as and for reasonable rentals and liquidated damages, but not as any penalty, was unenforceable where actual damages would not have been difficult to assess.

**[3] Vendor and Purchaser 400 ⟡179**

400 Vendor and Purchaser
    400IV Performance of Contract
        400IV(D) Payment of Purchase Money
            400k178 Mode and Sufficiency of Payment
                400k179 k. In General. Most Cited Cases
Purchasers could be credited with initial $50,000 payment under real estate sales contract, for purposes of determining whether purchasers paid enough of principal to be entitled to conveyance of realty demanded, although vendors contended that liquidated damages clause prevented counting initial payment as principal, where liquidated damages provision was unenforceable and there was no express provision for retention of earnest money by vendor in event of breach.

**[4] Damages 115 ⟡83**

115 Damages
    115IV Liquidated Damages and Penalties
        115k83 k. Questions for Jury. Most Cited Cases
Whether provision for damages is a penalty clause or li-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

Page 2

quidated damages clause is a question of law.

**[5] Damages 115 ☞76**

115 Damages
   115IV Liquidated Damages and Penalties
      115k75 Construction of Stipulations
         115k76 k. In General. Most Cited Cases
For liquidated damages clause to be enforceable, it must be shown that it was intention of parties to agree in advance as to settlement of damages that might arise upon breach of contract.

**[6] Damages 115 ☞79(1)**

115 Damages
   115IV Liquidated Damages and Penalties
      115k75 Construction of Stipulations
         115k79 Certainty as to Amount of Actual Damage
            115k79(1) k. In General. Most Cited Cases
Liquidated damages clause will be given effect if it is difficult to determine actual damages which would result in the event of breach.

**[7] Appeal and Error 30 ☞1050.1(9)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)10 Admission of Evidence
            30k1050 Prejudicial Effect in General
               30k1050.1 Evidence in General
                  30k1050.1(8) Particular Types of Evidence
                    30k1050.1(9) k. Secondary and Parol Evidence. Most Cited Cases

**Evidence 157 ☞450(8)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
      157XI(D) Construction or Application of Language of Written Instrument
         157k449 Nature of Ambiguity or Uncertainty in Instrument

         157k450 In General
            157k450(8) k. Contracts of Sale. Most Cited Cases
Terms employed in real estate sales contract, viewed in their entirety, expressed parties' intent that purchasers would have more than one option to demand warranty deeds as they paid for land and was not ambiguous and, accordingly, trial court erred in admitting extrinsic evidence about circumstances surrounding negotiation of contract; however, admission of the evidence was harmless error since it was clear that purchasers were entitled to request warranty deeds and that failure to deliver warranty deeds constituted a breach of the contract.

**[8] Contracts 95 ☞147(1)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k147 Intention of Parties
            95k147(1) k. In General. Most Cited Cases
Generally, intention of parties is to be determined in final agreement executed by them rather than from preliminary negotiations and construction placed upon agreement by parties, but when there is ambiguity arising from terms of contract, meaning may be derived from extrinsic facts surrounding information.

**[9] Contracts 95 ☞324(1)**

95 Contracts
   95VI Actions for Breach
      95k324 Nature and Form of Remedy
         95k324(1) k. In General. Most Cited Cases
To state cause of action for breach of contract, plaintiff must show existence of valid and enforceable contract, performance of contract by plaintiff, breach of contract by defendant, and resulting injury to plaintiff.

**[10] Vendor and Purchaser 400 ☞156**

400 Vendor and Purchaser
   400IV Performance of Contract
      400IV(B) Conveyance
         400k156 k. Production and Delivery of Vendor's Title Deeds. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

Vendors' failure to deliver warranty deeds requested by purchasers violated real estate sales contract which gave purchasers right to demand delivery of warranty deeds after payment of certain amount of principal.

[11] Contracts 95 ☞318

95 Contracts
    95V Performance or Breach
        95k318 k. Discharge of Contract by Breach. Most Cited Cases
Generally, where forfeiture has occurred in manner prescribed in contract, court will give effect to it; however, forfeitures are not favored by courts of equity and parties will be relieved from technical forfeiture if injustice results from its enforcement.

[12] Contracts 95 ☞318

95 Contracts
    95V Performance or Breach
        95k318 k. Discharge of Contract by Breach. Most Cited Cases
Whether breach of contract is material, thereby discharging the other's duty to perform, is a question to be decided based upon inherent justice of matter.

[13] Vendor and Purchaser 400 ☞110

400 Vendor and Purchaser
    400III Modification or Rescission of Contract
        400III(C) Rescission by Purchaser
            400k106 Right to Rescind
                400k110 k. Breach of Covenant or Condition in General. Most Cited Cases
Purchasers were not entitled to rescind or forfeit real estate sales contract when vendors breached contract by failing to deliver warranty deeds upon purchasers' payment of certain amount of principal; refusal to tender deeds did not go to essential purpose of contract and would not have deprived purchasers of possession of premises.

[14] Parties 287 ☞65(1)

287 Parties
    287IV New Parties and Change of Parties

        287k65 Striking Out Parties
            287k65(1) k. In General. Most Cited Cases
Once purchasers assigned real estate sales contract to bank, vendors became vested third-party creditor beneficiaries and since original contract did not authorize assignor or assignee to modify, revoke or otherwise alter contract and vendors never consented to releasing bank of its obligations, bank remained bound by its obligations under contract and bank should not have been dismissed as a party defendant in action between vendors and purchasers.

[15] Gifts 191 ☞1

191 Gifts
    191II Inter Vivos
        191k1 k. Nature of Gift in General. Most Cited Cases
A "donee beneficiary," is distinguished from creditor beneficiary, as third party to whom benefit comes without cost, such as donation or gift.

[16] Contracts 95 ☞187(1)

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of Third Person
                    95k187(1) k. In General. Most Cited Cases
A "creditor beneficiary" is a third party to whom a preexisting duty or liability is owed.

**1135*979***394 Morris Lane Harvey,Heidi A. Hoffee, The Law Offices of Morris Lane Harvey, Fairfield for Billy V. Bell and Barbara Joan Bell and also Indiana Nat. Bank.
Terrell Lee Sharp, Matt E. Beal, Law Office of Terry Sharp, P.C., Mt. Vernon, for Wayne Hickox and Lucille Hickox.
Justice CHAPMAN delivered the opinion of the court:
On September 22, 1976, Wayne and Lucille Hickox entered into a written agreement for the sale and purchase of 864 acres of real estate with Barbara and Billy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

Page 4

Bell. As the issues in this appeal center around the interpretation of that contract, we include herein pertinent portions of it:

"THIS AGREEMENT made this 22nd day of September, 1976, by and between WAYNE HICKOX and LUCILLE HICKOX, * * * hereinafter called "Sellers"; and BILLY V. BELL and BARBARA JOAN BELL, * * *, hereinafter called "Buyers".

WITNESSETH:

* * * * * *

Said real estate to be conveyed is described as fol- lows:

* * * * * *

containing in all, 864 acres more or less in Wayne County, Illinois * * *

2. PRICE AND TERMS: In consideration thereof, Buyers herein agree to pay Sellers herein the sum of SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00) In the manner following:

**1136 ***395 (a) The sum of ONE THOUSAND DOLLARS ($1,000.00) on the date of this offer and Acceptance and Earnest Money Receipt, dated July 2, 1976.

(b) On January 2, 1977, FORTY NINE THOU-SAND DOLLARS ($49,000.00).

(c) Remaining SIX HUNDRED AND FIFTY THOUSAND DOLLARS *980 ($650,000.00) shall be paid in annual payments commencing on December 1, 1977 and on December 1 of each year thereafter. The first five years, beginning December 1, 1977, payments shall be of interest only at 7 1/2 per cent upon unpaid balance. The following fifteen years commencing December 1, 1982, the Buyers shall pay the annual payment of TWENTY THOUSAND DOLLARS ($20,000.00) plus interest of 7.5% on the unpaid balance to the Sellers as hereinafter stated. Any balance of the payment at the end of said twenty year period,

to-wit: December 1, 1996, shall be due and payable by the Buyers to the Sellers herein. * * *

(d) Buyers herein shall have the option to pay the unpaid balance of the principal due and payable, or any part thereof under this Contract in multiples of One Thousand Dollars at any one annual payment period herein provided.

DISASTER CLAUSE:

It is further provided in said Contract that in the event the beans were less than twenty bushel (20 bu.) per acre, corn less than fifty bushel (50 bu.) per acre, or wheat less than twenty-seven and one-half bushel (27 1/2 bu.) per acre, or any one of them, that such yields shall be considered a disaster and the Buyers herein shall pay to the Sellers herein one-third of the annual payment, which is fixed at TWENTY THOU-SAND DOLLARS ($20,000.00) per year payable as herein stated.

* * * * * *

4. ABSTRACT:

* * * * * *

Buyers herein shall have the option as payments are paid upon the entire purchase price, which total acreage is figured at approximately EIGHT HUNDRED FIFTEEN DOLLARS ($815.00) per acre and that as the Buyers herein have paid the annual amount of money upon said contract; said money shall entitle the Buyers herein to a Warranty Deed to such land as may then be paid for based on $815.00 per acre, except

The East Half of the Northeast Quarter of Section Nineteen, Township One North, Range Nine East of the Third Principal Meridian, containing 80 Acres more or less, all situated in the County of Wayne and State of Illinois

shall be sold at ONE THOUSAND DOLLARS ($1,000.00) per acre if so selected. All costs of deeds and abstracts in such event shall be at Buyers' ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

pense; the conveyances selected by the Buyers shall be *981 carved out of the total acreage sold. * * *

Upon execution of this Agreement, Sellers herein shall execute their Warranty Deed to the Buyers herein for Eight Hundred Sixty-Four Acres (864A) herein described, which may be amended if prior deeds are made as provided herein.

* * * * * *

7. DEFAULT: Time shall be of essence of this agreement, and in the event Buyers herein shall default in the making of any of the payments by it to be made hereunder, or in the performance of any other covenant by it made, and such default shall continue for sixty (60) days after Sellers herein have given Buyers herein written notice of such default, Sellers herein at their option may declare this Agreement forfeited and terminated, and may re-enter possession of the subject land and retain all monies paid hereunder as and for reasonable rentals and liquidated damages, but not as any penalty. In the event the Sellers herein default in the performance of any of the conditions and covenants on their part to be performed, and such default shall continue for sixty (60) days after Buyers herein have given Sellers herein written notice of such default, Buyers herein may, at their option, declare this Agreement forfeited and terminated and shall have cause against the Sellers herein for **1137 ***396 all real damages incurred thereby, together with a return

of all money theretofore paid, plus the value of all improvements to said land less reasonable rental value thereof. Both parties do retain all alternative rights to have cause for specific performance of this Agreement, and the non-defaulting party shall be entitled to all reasonable attorney's fees, court costs and other expenses incurred in the enforcement of this provision as a part of their damages, whether at law or in equity, from the defaulting party.

* * * * * *

9. SCOPE: This agreement may be assigned by either party without the prior written consent of the other party; and the terms and covenants herein contained shall accrue to the heirs, devisees, executors, administrators, agents and assigns of the parties hereto, and in the event of such assignment, the assignors herein shall be relieved of liability. The Buyers may pre-pay the Contract or sell all or any part on Contract, but in such case, the Buyers shall remain liable to the Sellers herein. * * * "

The Bells paid the $1,000.00 earnest money deposit required under the contract. In addition, the record shows that payments under the contract to date, delivered to the Mt. Erie State Bank as escrow agent, are as follows:

| | | | |
|---|---|---|---|
| $49,000.00 | (principal) | January 3, | 1977 |
| $48,750.00 | (interest) | December 1, | 1978 |
| $48,750.00 | (interest) | December 2, | 1979 |
| $48,750.00 | (interest) | December 1, | 1980 |
| $48,750.00 | (interest) | November 27, | 1981 |
| $48,750.00 | (interest) | December 1, | 1982 |
| $20,000.00 | (principal | December- | 1982 |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

Page 6

| 0 | ) | ber 1, | |
| $47,381.25 | (interest) | December 2, | 1983 |
| $6,666.67 | (principal) | December 2, | 1983 |
| $46,620.14 | (interest) | December 1, | 1984 |
| $6,666.67 | (principal) | December 1, | 1984 |

**\*982** The record shows that the payments made up to and including the interest payment of December 1, 1980, were made by the Bells. The payments of November 27, 1981, and thereafter were made by Herbert and Victor Hess.

In a letter dated June 25, 1985, addressed to Mr. and Mrs. Hickox, Michael Molt, an attorney representing the Bells, requested that the Hickoxes execute a warranty deed conveying to the Bells 83.67 acres of the total 864 acres referred to in the contract. The letter explained that the contract between the Hickoxes and the Bells provides that the Bells are entitled to receive a warranty deed for certain real estate based on the amount of principal which has been paid to date. Mr. Molt noted that with the exception of a purchase price of $1,000 per acre allocated to one 80-acre tract, the contract specifies that the real estate is priced at $815 per acre. Mr. Molt calculated that to date $83,333.34 had been paid as principal under the contract. Mr. Molt advised the Hickoxes that the Bells desired to allocate $80,000 of that amount to the 80-acre tract priced at $1,000 per acre. The other 3.67 acres included in the deed was only part of the 4.089 acres, valued at $815 per acre, the Bells were to date entitled to receive. The 3.67-acre tract was improved with a machine shed, cattle feed bunk and feeding floor with a concrete lot and two steel harvester silos. The Hickoxes did not execute the deed nor did they reply to Mr. Molt's correspondence.

On November 25, 1985, Billy and Barbara Bell served a Notice of Termination of Agreement for Sale and Purchase of Real Estate upon Lucille Hickox. The notice alleges that the Hickoxes are in default for failure to honor the requirement of the contract requiring the Hickoxes to deliver certain warranty deeds to the Bells. The notice provides that all obligations, responsibilities and requirements in the contract are terminated, and that possession of the real estate is returned to the Hickoxes.

**\*983** Mr. and Mrs. Hickox subsequently filed a six-count complaint in the circuit court naming as defendants Billy Bell, Barbara Bell and the Indiana National Bank as Trustee under trust number 13917-005. Counts I, II and III, directed against the Bells, allege that the plaintiffs are not in default of the contract between the parties; the Bells failed to pay sufficient consideration to entitle them to conveyance of the realty they demanded; and the Bells are not entitled to a forfeiture or termination of the contract. The complaint also contains allegations that the Bells breached the contract by failing or refusing to make **\*\*1138 \*\*\*397** payments for 1985; to maintain the fertility of the land; and to maintain insurance on the land, or to otherwise repair the damage which has occurred to various buildings on the land. Plaintiffs claim that as a result of the Bells' breach of contract the value of the land has decreased substantially resulting in damage to the plaintiffs in excess of $300,000.

Counts IV, V and VI of the Hickox complaint are directed at the Indiana National Bank as trustee under trust number 13917-005. Those counts allege that on or about December 31, 1980, the Bells entered into a contract for the sale and purchase of real estate with the Indiana National Bank, as trustee under the trust number above designated, as buyer. Pursuant to that contract the Indiana National Bank, as purchaser on behalf of Herbert and Victor Hess, agreed to assume the indebtedness of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 7

the Bells to the Hickoxes in the amount of $653,927.08, and to assume all covenants required of the Bells under their contract with the Hickoxes. Counts IV and V, with which we are concerned in this appeal, set forth the agreement between the Hickoxes and the Bells, the agreement between the Bells and the bank, and service of the demand for the deed by the Bells. Count IV prays that the court declare that the Hickoxes are not in default and that the agreement is in full force and effect. Count V sets forth the same allegations as count IV and further alleges that the bank failed and refused to make payments on the contract. That count asks the court to award the plaintiffs a money judgment against the bank for the past-due installments.

The Indiana National Bank filed a motion to dismiss those counts of the complaint directed against it. In an affidavit attached to the motion, attorney Michael Molt stated that after the bank entered into the contract with the Bells it assigned the contract to the Hesses, and that after the assignment from the bank to the Hesses, the Hesses had possession and use of the property and made the payments on the contract. The affidavit further stated that in May of 1985 the Hesses entered into an agreement with the Bells under **\*984** which the Hesses assigned all of their right, title, and interest in the real estate back to the Bells. That contract, in effect, purported to relieve the Hesses and the bank from any obligation to pay the Hickoxes.

The trial court's docket entry, dated November 17, 1986, granted the Indiana National Bank's motion to dismiss, stating that "Counts IV and V make no allegation that a contractual relationship existed between the Bells and Bank when the agreement between Hickoxes and Bells was breached." Plaintiffs thereafter sought leave of court to amend the complaint as to the bank. The court denied the motion to amend and subsequently denied the plaintiffs' motion to reconsider.

The Bells filed a counterclaim. Count I of the counterclaim sought a declaration by the court that the contract between the parties is terminated, and that the Bells are entitled to reimbursement of all sums paid to the Hickoxes and are also entitled to attorney fees and costs incurred as a result of this action. The Bells in count II

prayed for the same remedies as were requested in count I, and in the alternative prayed that the court order specific performance of the contract as to conveyance of the realty demanded by the Bells. Count III of the counter-claim requested that the court declare the contract terminated and award the Bells an amount equal to the fair market value of the realty which the Bells demanded the plaintiffs convey by deed. Count III also prayed for an amount equal to the reasonable attorney fees and costs incurred by the Bells in enforcing the contract.

Following a trial on the dispute between the Hickoxes and the Bells, the court entered a seven-page, written order on August 21, 1987. The court's findings included the following:

(1) The parties entered into a contract for the sale and purchase of real estate.

(2) Pursuant to the contract the defendants were entitled to a Warranty Deed to portions of land conveyed under the contract prior to the completion of said contract as principal payments **\*\*1139 \*\*\*398** were paid toward the contract. The amount of land to which they were entitled was to be based upon a value of $815 per acre except for one 80-acre tract which is to be valued at $1,000 per acre.

(3) That as of June 25, 1985 the defendants had paid toward the principal amount owed $83,333.34.

(4) The failure of plaintiffs to deliver the Warranty Deed requested by defendants was a breach of the contract, but said breach was not so material or substantial so as to entitle defendants to rescission or to forfeiture or termination.

**\*985** (5) Defendants are entitled to specific performance with regard to the request for Warranty Deed.

(6) Plaintiffs had actual possession of the premises during 1986, and through the date of the hearing in this case.

(7) Defendants are entitled to possession of the premises and to any rents and profits generated during

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 8

plaintiffs' possession of the premises.

(8) That the rents and profits, including government payments, generated by the subject property during the year 1986, net of real estate taxes paid upon the property by the plaintiffs, is $23,449.13.

(9) That the parties stipulated in open court that the tracts of land for which a deed was demanded by defendants in June of 1985 have diminished in value by $16,000 since the time of said demand. Defendants are entitled to recover from plaintiffs for the diminution in value by reason of plaintiffs' refusal to convey said property.

(10) Pursuant to the agreement, defendants are entitled to recover from plaintiffs their attorney fees incurred in this cause in the amount of $14,933.57.

(11) Plaintiffs shall deliver to defendants Warranty Deeds to the parcels requested by defendants together with proof of merchantable title thereto.

(12) Defendants shall be obligated to the plaintiffs to pay the annual principal installments with interest for the years 1985 and 1986 in the total amount of $132,500. Defendants shall be entitled to a credit against said amount of $54,382.70, said sum representing the $16,000 diminution in value of the tracts, $23,449.13 in rents and profits including government payments obtained by the plaintiffs during the year 1986, and $14,933.57 as defendants' attorney fees in this cause, leaving a net amount due plaintiffs $78,117.30.

Billy and Barbara Bell appeal from the judgment of the trial court asking that the judgment be reversed as to the trial court's refusal to recognize a forfeiture and termination of the contract. The Hickoxes also appeal from the trial court's decision. The Hickoxes raise three issues for our review. The first issue is whether the Bells paid a sufficient amount of principal to entitle them to conveyance of the realty demanded. The second issue is whether the court erred in finding the plaintiffs in default of the contract. Third, the plaintiffs argue that the trial court erred in dismissing the Indiana National Bank

as a party defendant. We will first consider whether the Bells **\*986** paid a sufficient amount of principal to be entitled to a conveyance of the 83.67 acres they demand under the contract.

[1] In its order dated August 21, 1987, the court found that the defendants had paid $83,333.34 toward the principal amount owed under the contract. The Hickoxes first argue that the only payment against principal made by the Bells was the $50,000 down payment, and that any amount of money paid by the Hesses is not to be credited to the Bells as payment under the contract. The contract allows for assignment by the parties. The validity of the assignment and reassignment of the contract by the Bells to the Hesses, and the Hesses to the Bells, was never raised in the circuit court. It is axiomatic that questions not raised in the trial court are deemed waived and may not be raised for the first time on appeal. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill.2d 486, 86 Ill.Dec. 493, 500, 500, 475 N.E.2d 872, 879; **\*\*1140\*\*\*399***Board of Education v. Kusper* (1982), 92 Ill.2d 333, 343, 65 Ill.Dec. 868, 874, 442 N.E.2d 179, 184.) We assume, therefore, that the assignment is valid. "It is well settled in Illinois that when a valid assignment is executed, the assignee (1) acquires all of the interest of the assignor in the property that is transferred and (2) stands in the shoes of the assignor." (*Stavros v. Karkomi* (1976), 39 Ill.App.3d 113, 123, 349 N.E.2d 599, 607.) As the right to assignment of the contract was clearly provided for in the written agreement, and since the validity of the assignment and reassignment of the contract between the Bells and the Hesses was not contested at trial, we find that the money paid by the Hesses under the contract is to be credited to the Bells as payment under the contract.

[2][3] The Hickoxes next argue that assuming that all amounts which the Mt. Erie State Bank shows paid are credited to the Bells as payment under the contract, the Bells have not paid a sufficient amount of principal to be entitled to a conveyance of 83.67 acres. They contend that, assuming early-deeding is authorized under the contract, the most the Bells could be credited for as principal with regard to the early-deeding provision, is $33,333.34. The Hickoxes theorize that the initial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 9

$50,000 paid by the Bells is a down payment, not intended to be credited as principal until all other annual payments have been paid under the contract. Plaintiffs draw our attention to paragraph 7 of the contract which provides that upon default of any payment, "Sellers * * * may declare this Agreement forfeited and terminated, and may re-enter possession of the subject land and *retain all monies paid* hereunder as and *for reasonable rentals and liquidated damages,* but not as any penalty." (Emphasis added.) They argue that to allow the $50,000 to be applied against principal in an early-deeding **\*987** of the property would: (1) ignore the liquidated damages clause in the contract, and (2) defeat the purpose of a down payment in a land installment contract; that is to provide the vendor security for the purchaser's performance of the contractual obligations.

[4][5] Although the issue was not raised by the parties, we find it first necessary to determine whether the forfeiture provision is for a penalty or liquidated damages. Whether a provision for damages is a penalty clause or a liquidated damages clause is a question of law. (*Weiss v. United States Fidelity & Guaranty Co.* (1921), 300 Ill. 11, 16, 132 N.E. 749, 751; *Morris v. Flores* (1988), 174 Ill.App.3d 504, 506, 124 Ill.Dec. 122, 124, 528 N.E.2d 1013, 1015.) If the purported liquidated damages clause herein is in fact a penalty imposed upon a party to secure prompt performance of a contract rather than a term giving compensatory damages to the nondefaulting party, then it is unenforceable. (*Scofield v. Tompkins* (1880), 95 Ill. 190, 193; *Heckmann v. Mid States Development Co.* (1965), 60 Ill.App.2d 113, 207 N.E.2d 715.) In *Bauer v. Sawyer* (1956), 8 Ill.2d 351, 359, 134 N.E.2d 329, 333, our supreme court quoted the Restatement of Contracts as a declaration of the requirements a party must meet in order to show that a contractual provision is for liquidated damages and is not a penalty:

"An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused

by the breach is one that is incapable or very difficult of accurate estimation." (Restatement of Contracts § 339(1) (1932); See also Restatement (Second) of Contracts § 356(1) (1979).)

In addition to the above requirements for determining that a damages clause is enforceable, it must be shown that it was the intention of the parties to agree in advance as to the settlement of damages that might arise upon a breach of contract. *Heckmann v. Mid States Development Co.* (1965), 60 Ill.App.2d 113, 118, 207 N.E.2d 715, 718; *Curtin v. Ogborn* (1979), 75 Ill.App.3d 549, 554, 31 Ill.Dec. 391, 396, 394 N.E.2d 593, 598.

[6] We are aware that a liquidated damages clause will be given effect if it is **\*\*1141 \*\*\*400** difficult to determine the actual damages which would result in event of breach. We do not find the actual damages difficult to assess in this case. The contract establishes the value the parties had determined as the per-acre value of the land to be conveyed. Evidence as to land values is available and could easily be used to calculate any increase or diminution in value to the land in question. Furthermore,**\*988** it would not be difficult to calculate the rent and or profits generated during any party's possession of the premises. As a determination of actual damages in the event of breach of contract would not be difficult, we find as a matter of law that the liquidated damages clause is not enforceable.

Notwithstanding our finding that the liquidated damages clause is unenforceable, plaintiffs argue that to allow the $50,000 down payment to be applied against principal in early-deeding of the property would deprive them of security for the purchasers' performance of the contract. Plaintiffs cite *Pruett v. LaSalceda, Inc.* (1977), 45 Ill.App.3d 243, 3 Ill.Dec. 917, 359 N.E.2d 776, in support of their position that the seller may retain a down payment even though there was nothing in the contract authorizing its retention. In *Pruett* the purchasers brought suit against sellers to recover earnest money paid to the sellers pursuant to a written contract for the purchase of a home. The sales contract required a partial down payment of $1,000, with the balance of the down payment, $7,700.00, to be paid within ten

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 10

days and the balance of the purchase price due at closing. Upon the purchasers' default the court held in favor of the sellers in allowing them to retain the earnest money deposit. *Pruett* relied on *Linster v. Regan* (1969), 108 Ill.App.2d 459, 248 N.E.2d 751, which held that, in the absence of an express contract provision to the contrary, earnest money or down payment should be accepted as the bargain and agreement of the parties as an assurance to the seller that the buyer will perform. *Linster,* 108 Ill.App.2d at 463, 248 N.E.2d at 753.

As in *Pruett* and *Linster,* the contract in the case at bar contains no express provision for the retention of the earnest money by the seller in the event of breach. *Pruett* and *Linster,* however, did not involve installment contracts where early-deeding was contemplated by the parties. The contract at issue does contain an express provision that:

"Buyers herein shall have the option as payments are paid upon the entire purchase price * * * and that as the Buyers herein have paid the annual amount of money upon said contract; said money shall entitle the Buyers herein to a Warranty Deed to such land as may then be paid for."

To read the provision "to such land as may then be paid for" as *not* including the $50,000 down payment would be contrary to the unequivocal meaning of the contract read as a whole. The law is well settled that a contract must be read as a whole without any one clause standing alone. (*Board of Trade v. Dow Jones & Co.* (1983), 98 Ill.2d 109, 122, 74 Ill.Dec. 582, 588, 456 N.E.2d 84, 90; *989La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill.2d 375, 381, 12 Ill.Dec. 565, 568, 370 N.E.2d 188, 191,*cert. denied*436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768.) Plaintiffs argue that the buyers and the trial court have ignored the term "annual amount of money." Plaintiffs assert that this phrase refers to the annual payments required under the contract, and that only the annual payments may be used in calculating the amount of principal which has been paid toward the purchase price in effectuating the early-deeding of property. We disagree. To give the contract provision at issue the meaning plaintiffs ascribe to it would require our inserting language in the contract

which is clearly not there. It is our opinion that based on the contract language and the nature of the undertaking therein declared, the $50,000 down payment was included in the phrase "such land as may then be paid for." Plaintiffs themselves admit that the $50,000 was to be applied as principal against the total purchase price. Had the parties desired to limit the early-deeding of property to land valued at an amount of principal as then paid for, less the $50,000 down payment, **1142 ***401 such language should have been included in the contract. No such language having been included, we agree with the meaning ascribed to the contract provision by the trial court.

[7] Before we address the issue of whether the trial court erred in finding that the plaintiffs' failure to deliver the warranty deeds requested by defendants was a breach of the contract, we will first address the issue whether the trial court properly admitted extrinsic evidence in interpreting the contract. Plaintiffs argue that the contract does not completely disclose the agreement between the parties concerning the restriction on early-deeding for the sole purpose of building a house. Plaintiffs insist that admission of the extrinsic evidence was necessary for the court to discern the true intent of the parties in providing for early-deeding and in limiting early-deeding only to land upon which to build a house. Plaintiffs contend that the trial court erred in construing the contract along with the extrinsic evidence to allow early-deeding for anything other than to allow the buyers to construct a house and for any tract of land less than what is described in the contract as an entire tract. The Bells argue that the trial court did not find the agreement ambiguous, and that the admission of extrinsic evidence was not proper.

[8] The primary object of a court in construing a contract is to give effect to the intention of the parties. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill.2d 272, 283, 154 N.E.2d 683, 689.) Generally the intention of the parties is to be determined from the final agreement executed by them rather than from preliminary negotiations*990 and the construction placed upon the agreement by the parties (*Lenzi v. Morkin* (1984), 103 Ill.2d 290, 293, 82 Ill.Dec. 644, 645, 469 N.E.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

Page 11

178, 179; *Martindell,* 15 Ill.2d at 283, 154 N.E.2d at 689), but when there is an ambiguity arising from terms of a contract, meaning may be derived from extrinsic facts surrounding formation. *Mid City Industrial Supply Co. v. Horwitz* (1985), 132 Ill.App.3d 476, 482, 87 Ill.Dec. 279, 283, 476 N.E.2d 1271, 1275; *La Throp v. Bell Federal Savings & Loan* (1977), 68 Ill.2d 375, 384, 370, 12 Ill.Dec. 565, 568, N.E.2d 188, 192, *cert. denied*(1978), 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768.

As has already been detailed in the beginning of this opinion, the contract provides that the "[b]uyers herein shall have the option as payments are paid upon the entire purchase price * * * and that as the [b]uyers herein have paid the annual amount of money upon said contract; said money shall entitle the [b]uyers herein to a Warranty Deed to such land as may then be paid for." The option provision of the contract further provides that "all costs of deeds and abstracts * * * shall be at [b]uyers' expense; the conveyances selected by the [b]uyers shall be carved out of the total acreage sold." It is clear that the terms employed in the agreement viewed in their entirety express the parties' intent that the purchasers would have more than one option to demand warranty deeds as they paid for the land. The option provision refers to more than one deed and one abstract by the use of the plural of those words. The use of the term *carved out* also evidences the parties' intent to allow for early-deeding of acreage if the purchasers chose to exercise said option and it expresses no restriction as to the amount or location of acreage. The express language of the agreement convinces us that no ambiguity exists. The mere fact that the parties do not agree upon the meaning of the terms of a contract does not create an ambiguity. *L.K. Comstock & Co. v. Morse/ UBM Joint Venture* (1987), 153 Ill.App.3d 475, 480, 106 Ill.Dec. 462, 465-66, 505 N.E.2d 1253, 1256-1257.

In view of our finding that the contract is not ambiguous the court erred in admitting the extrinsic evidence about the circumstances surrounding the negotiation of the contract. We find, however, after reviewing the record and the extrinsic evidence admitted at trial that the admission of said evidence was harmless error. The

evidence consisted of a transcript of a tape-recorded meeting between the Hickoxes and the Bells to discuss the terms of the sale of the Hickox farm, which occurred **1143 ***402 prior to execution of the contract. Present at that meeting were Wayne and Lucille Hickox, Bill and Barbara Bell, the Hickoxes' attorney William Kidwell, and his wife, Irma Kidwell. With the consent of all those present Irma Kidwell recorded *991 a substantial portion of that meeting. References made by the parties at that meeting to early-deeding of acreage were as follows:

"MR. BELL: When we get so much paid on the principal, then we can get some land made into our name.

* * * * * *

Lets bring something else up. There are three things that Wayne and Mrs. Hickox have agreed on and Bill didn't get it on there.

We get so many acres after so many dollars was paid, if we want to build a new house on there, they are not going to let us borrow money for a house on a contract place. You have to own it. What we discussed was [S]ay we get the 80A paid for. Or the home place paid for, or whatever we got enough principal paid down on would go into our names so we could go ahead with a house.

WKK: Is that satisfactory with you folks.

WAYNE: Yes we agreed.

WKK: Let me get this on the record here so I can pick it up. Do you want me to figure the price on 80A or do you want it specified now.

MR. BELL: No because we don't know the place that well.

WKK: Let the contract show that when the buyers have paid a sufficient amount to warrant the conveyance of a Warranty Deed to them that the contract to purchase shall permit such a sale. The Sellers agree that they will convey by good and sufficient Warrant[y] Deed such acreage as such payment as been

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133

195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392

**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

made on contract.

"WKK: That is going to put a little more expense on you because you are going to have to carve out whatever acreage you want. Wayne do you want to split the cost of the Abstract to carve it out? Do you or have you said anything about if these folks have that year to or put an option in here about a delay in payment."

Contrary to plaintiffs' belief, the negotiations that took place between the parties as evidenced by the transcript of the meeting do not conclusively establish that constructing a house was the sole reason that the Bells requested early-deeding. It is also clear that the parties did not discuss limiting the early conveyance of acreage to specific tracts.

[9][10] We find that the contract does not limit the early conveyance of acreage to land necessary to build a house. Nor does the contract restrict early-deeding of acreage to entire tracts. As noted *supra,* defendants paid a sufficient amount of principal to entitle them **992 to an early conveyance of property. It is clear from the face of the contract that defendants were entitled to request the warranty deeds demanded of the Hickoxes, and that the Hickoxes' failure to deliver the warranty deeds constituted a breach of contract. To state a cause of action for breach of contract a plaintiff must show (1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff. (*Allstate Insurance Co. v. Winnebago County Fair Association, Inc.* (1985), 131 Ill.App.3d 225, 233, 86 Ill.Dec. 233, 239, 475 N.E.2d 230, 236.) A defendant's failure to comply with the duty imposed by the contract gives rise to the breach. (*Allstate Insurance,* 131 Ill.App.3d at 233, 86 Ill.Dec. at 239, 475 N.E.2d at 236.) We agree with the trial court's finding that plaintiffs' failure to deliver the warranty deeds requested by defendants was a breach of the contract.

[11][12][13] We now turn to the issue raised by the Bells, that is whether the trial court erred in refusing to recognize a forfeiture and termination of the contract. The Bells argue that the default provision of the con-

tract gave them the option to declare the contract forfeited and terminated or to seek specific performance of the contract. It is true that generally where a forfeiture has occurred in the manner prescribed in a **1144 ***403 contract the court will give effect to it. (See, *e.g.,Eade v. Brownlee* (1963), 29 Ill.2d 214, 219, 193 N.E.2d 786, 789.) However, forfeitures are not favored by courts of equity and the parties will be relieved from a technical forfeiture if injustice results from its enforcement. (See, *e.g., Rose v. Dolejs* (1953), 1 Ill.2d 280, 289-290, 116 N.E.2d 402, 409; *Allabastro v. Wheaton National Bank* (1979), 77 Ill.App.3d 359, 366, 32 Ill.Dec. 831, 836, 395 N.E.2d 1212, 1217; *Krentz v. Johnson* (1976), 36 Ill.App.3d 142, 145, 343 N.E.2d 165, 167.) Whether or not a breach of contract is material, thereby discharging the other's duty to perform, is a question to be decided based upon the inherent justice of the matter. *Hanson v. Duffy* (1982), 106 Ill.App.3d 727, 732, 62 Ill.Dec. 401, 406, 435 N.E.2d 1373, 1378, quoting *Leazzo v. Dunham* (1981), 95 Ill.App.3d 847, 850, 51 Ill.Dec. 437, 440, 420 N.E.2d 851, 854. See also Restatement (Second) of Contracts § 241 and Comments (1979).

Here the refusal to tender the deeds did not go to the essential purpose of the contract. The refusal of the Hickoxes to execute the warranty deeds requested by the Bells would not have deprived the Bells of possession of the premises. The record reflects that the Bells voluntarily relinquished possession after notice of termination of the contract was served on the Hickoxes. The Hickoxes never refused to accept payments made under the contract, and there was never any attempt by the Hickoxes to preclude the Bells from continuing *993 their farming operations on the land in question. In addition, there was no evidence that the Hickoxes were abandoning the contract. Under the circumstances the general purpose of the contract could be accomplished without declaring a forfeiture by ordering the Hickoxes to convey the executed warranty deeds requested by the Bells, ordering the payment of any damages sustained by the Bells, and ordering the Bells to make the installment payments due under the contract.

It is well settled that a reviewing court will not disturb

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)

the findings of the trier of fact unless clearly against the manifest weight of the evidence. (*Ray v. Winter* (1977), 67 Ill.2d 296, 307, 10 Ill.Dec. 225, 231, 367 N.E.2d 678, 684.) The trial court found that, as the breach of the contract by the Hickoxes was not material, the notice of termination served by the Bells was not effective to rescind or forfeit the contract. We agree with the trial court's finding that the Bells are entitled to specific performance with regard to their request for warranty deeds. We further agree with the lower court's finding that the Bells are entitled to possession of the premises described in the contract and to any damages incurred by them as a result of plaintiffs' breach. As the parties do not raise the issue of whether the damages awarded by the court are proper, we need not address that issue.

[14][15][16] The plaintiffs' final issue on appeal is whether the trial court erred in dismissing the Indiana National Bank as a party defendant. Plaintiffs allege that once the contract was entered into between the Bells and the bank, under which the bank agreed to pay the indebtedness owed under the contract to the Hickoxes, the Hickoxes became third-party beneficiaries of the contract between the Bells and the bank. The Hickoxes argue that their third-party beneficiary status gives them a vested right which cannot be modified without the Hickoxes' prior consent.

The courts in Illinois have distinguished between third-party donee beneficiaries and third-party creditor beneficiaries in determining what rights each has with regard to the third-party contract. A donee beneficiary, as distinguished from a creditor beneficiary, is a third party to whom the benefit comes without cost, such as a donation or gift. A creditor beneficiary is a third party to whom a preexisting duty or liability is owed. (*Robson v. Robson* (N.D.Ill.1981), 514 F.Supp. 99, 102.) The Hickoxes are categorized as creditor beneficiaries. The courts of this state have consistently held that the third-party beneficiary obtains a vested right as against the promisor, and this right, once given, deprives the promisor of any interest or right in the subject matter of the promise, including the right to alter, rescind or revoke the **1145 ***404 promise. (*994Bay v. Williams* (1884), 112 Ill. 91, 1 N.E. 340; *Conerty v. Richstieg*

(1942), 379 Ill. 360, 41 N.E.2d 476; *Town & Country Bank v. Canfield Contracting Co., Inc.* (1977), 55 Ill.App.3d 91, 12 Ill.Dec. 826, 370 N.E.2d 630; *Pliley v. Phifer* (1954), 1 Ill.App.2d 398, 117 N.E.2d 678.) Because creditor beneficiary cases only involve situations where a preexisting duty or liability is contractually transferred to a new party, there is never any question that the third-party beneficiary's rights vest as soon as the contract is executed. *Robson*, 514 F.Supp. at 102; *Pliley*, 1 Ill.App.2d at 407, 117 N.E.2d at 682.

The contract between the Hickoxes and the Bells allowed the parties to assign their rights and obligations under the contract. Once the Bells assigned the contract to the Indiana National Bank, the Hickoxes became vested third-party creditor beneficiaries. The original contract did not authorize the assignor or assignee to modify, revoke or otherwise alter the contract. Accordingly, as the Hickoxes never consented to releasing the Indiana National Bank of its obligations, the bank remains bound by its obligations under the contract. Therefore, we find that the trial court erred in dismissing the Indiana National Bank as a party defendant.

The bank contends that even if the Hickoxes are third-party beneficiaries of the agreement entered into between the Bells and the bank they are beneficiaries of an agreement which by its terms did not preclude modification or reassignment of the agreement. It is the bank's position that once it assigned the rights and obligations conferred upon it by the Bells to another party, it was absolved of any liability on the original contract between the Hickoxes and the Bells. The Indiana National Bank cites the Restatement (Second) of Contracts Section 311 (1979) in support of its theory that the court properly dismissed it as a party defendant. That section provides that, in the absence of language in the contract making the rights of a third-party beneficiary irrevocable, "the promisor and promisee retain the power to discharge or modify the duty by subsequent agreement" until such time as the beneficiary, without notice of the discharge or modification, "materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee." With the exception of *Board of Edu-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

552 N.E.2d 1133
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392
**(Cite as: 195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392)**

Page 14

*cation v. Village of Hoffman Estates* (1984), 126 Ill.App.3d 625, 81 Ill.Dec. 942, 467 N.E.2d 1064, which pointed out that apparently the majority of jurisdictions have now adopted the rule set forth in section 311, our research has not revealed any case in Illinois recognizing the application of that section.

In view of our supreme court's long-standing ruling on the immediate\*995 vesting of creditor beneficiaries' rights we do not feel free to adopt the position of the Restatement (Second) of Contracts Section 311 (1979). However, even if we were to do so, it would not change the result herein. Under the facts of this case if the plaintiffs were able to plead and prove that they had materially changed their position in justifiable reliance on the promise or that they had assented to it at the request of the Indiana National Bank or the Bells, they would come under the provisions of section 311 of the Restatement. Therefore, even under the bank's position we feel that the trial court erred in refusing to allow the plaintiffs to amend their complaint. We reverse the trial court's order dismissing the Indiana National Bank as a party defendant, and remand for proceedings consistent with this opinion.

For the reasons given, the judgment of the circuit court is affirmed in part and reversed in part and remanded.

Affirmed in part, reversed in part and remanded.

RARICK and GOLDENHERSH, JJ., concur.
Ill.App. 5 Dist.,1990.
Hickox v. Bell
195 Ill.App.3d 976, 552 N.E.2d 1133, 142 Ill.Dec. 392

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

25 Ill.App. 130
25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.)
**(Cite as: 25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.))**

Page 1

**C**
N. D. C. HUME v. M. P. BROWER ET AL.
Ill.App. 3 Dist. 1886.

Appellate Court of Illinois, Third District.
N. D. C. HUME
v.
M. P. BROWER ET AL.
November Term, 1886.

West Headnotes

**Contracts 95 ☞187(1)**

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of
Third Person
                    95k187(1) k. In General. Most
Cited Cases
A third party may sue on a simple contract entered
into by others for his benefit.

**Contracts 95 ☞187(1)**

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of
Third Person
                    95k187(1) k. In General. Most
Cited Cases
Where third party to contract made for his benefit
between two other parties notified them of his ac-
ceptance of it, his act in thereafter taking a note
from one of the parties for his debt, did not relieve
the other party who had by such contract agreed to
pay the debt.

**Contracts 95 ☞187(2)**

95 Contracts

95II Construction and Operation
    95II(B) Parties
        95k185 Rights Acquired by Third Persons
            95k187 Agreement for Benefit of
Third Person
                95k187(2) k. Contract to Pay
Money to a Third Person. Most Cited Cases
Upon an agreement by one person to pay all the
debts of another, any creditor of the latter party
may maintain an action.

**Contracts 95 ☞269**

95 Contracts
    95IV Rescission and Abandonment
        95k269 k. Persons as Against Whom Con-
tract May Be Rescinded. Most Cited Cases
Where third party to contract made for his benefit
between two other parties, notified them of his ac-
ceptance of it, they could not thereafter rescind the
contract as against the third party without his con-
sent.

**Contracts 95 ☞328(4)**

95 Contracts
    95VI Actions for Breach
        95k328 Defenses
            95k328(4) k. Defenses in Actions on Con-
tracts for Benefit of Third Persons. Most Cited Cases
In suit by third party based on contract between two
other parties made for his benefit, the kind or
quantity of consideration paid for the contract can-
not be raised if there was any consideration.

**\*1 [Opinion filed June 14, 1887.]**

APPEAL from the Circuit Court of Pike County;
the Hon. CHARLES J. SCOFIELD, Judge, presid-
ing.

Messrs. A. C. MATTHEWS and H. D. L.
GRIGSBY, for appellant.
When one enters into a simple contract for the be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 Ill.App. 130
25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.)
**(Cite as: 25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.))**

Page 2

nefit of another, the party for whose benefit the contract is made may sue upon the contract in his own name. Schemerhorn v. Vanderheyden, 1 Johns. 139;Elwood v. Monk, 5 Wend. 235;Arnold v. Lyman, 17 Mass. 400;Hall v. Marston, 17 Mass. 575;Brewer v. Dyer, 7 Cush. 337;Barker v. Bucklin, 2 Denio, 45; Carnegie v. Morrison, 2 Metc. 381; Eddy v. Roberts, 17 Ill. 505;Brown v. Strait, 19 Ill. 88;Bristow v. Lane, 21 Ill. 194;Struble v. Hake, 14 Ill. App. 546;Snell v. Ives, 85 Ill. 279;Shober v. Kerting, 107 Ill. 344. In the latter two cases, it was held that if the contract was to pay all the debts of another, without specifying any, any creditor could maintain an action.

The distinction between the form of actions on contracts under seal and those not under seal (except penal bonds), is abolished by Sec. 19, Chap. 110, R. S. 1874, p. 776; Protection Life Ins. Co. v. Palmer, 81 Ill. 88;City of Shawneetown v. Baker, 85 Ill. 563;Adam v. Arnold, 86 Ill. 185.

Under the law as it now is, if a contract under seal is made for the benefit of a third party, the third party may maintain action for a breach in his own name. Dean v. Walker, 107 Ill. 540.

An executory contract under seal can not be altered, changed or varied by an instrument not under seal. Loach v. Farnum, 90 Ill. 368;Hume v. Taylor, 63 Ill. 43;Barnett v. Barnes, 73 Ill. 216.

When two parties enter into a contract for the benefit of a third party, it is not in their power to rescind the same after notice and acceptance by the third party, without his consent. Bishop on Contracts, Sec. 1223, and note; Wood v. McClaine, 7 Ala. 800;Taylor v. Robinson, 14 Cal. 396;Fiske v. Holmes, 41 Maine, 441.

When one bargains for another without authority, the latter may ratify or repudiate the bargain at his pleasure. Bishop on Contracts, Sec. 1223, and authorities cited in notes; 35 Ill. 40-544;41 Ill. 323;50 Ill. 26;69 Ill. 575;82 Ill. 73;81 Ill. 607;83 Ill. 136.

Messrs. WIKE & HIGBEE and ORR & CRAWFORD, for appellees.

PLEASANTS, P. J.

**\*2** Appellees, who are brothers, jointly made an agreement under seal and dated July 1, 1884, with Philip S. Brower, their father, whereby, in consideration of his leasing to them certain personal property described, consisting of live stock, farming implements and growing crops, for ninety-nine years, they bound themselves, among other things, "to pay all the debts now owing by the said party of the first part in two years" from that date. It further provided "that in case the parties of the second part fail to comply with any of the conditions of this lease, then the parties of the second part shall deliver up to the said party of the first part all the personal property or its value in money."

At that time Philip S. Brower was owing appellant $80 on a note of January 1, 1884, payable one day after date, and $28 for a cultivator purchased of him June 16th, which was not due until September 1, 1884.

Appellant claims that he was advised of this agreement by one of the sons and notified him that he accepted and ratified it, and about the first of September, 1886, he brought this suit thereon before a Justice of the Peace for the indebtedness mentioned, which was taken by appeal to the Circuit Court whereupon trial was had without a jury; the issues were found and judgment rendered for the defendants.

It has long been settled that a third party may sue on a simple contract entered into by others for his benefit, and upon such an agreement to pay all the debts of one party, any creditor of such party may maintain an action.Shober v. Kerting, 107 Ill. 344;Snell v. Ives, 85 Ill. 279. The old distinction, with reference to this right, between simple contracts and specialties, is abolished by Sec. 19, Chap. 110, R. S.; Dean v. Walker, 107 Ill. 540.

Appellees argue that the agreement here was not within the rule declared by the authorities, because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 Ill.App. 130
25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.)
**(Cite as: 25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.))**

Page 3

(it is said) the consideration moving from the promisee to the promisors was not money, or property to be converted into money, for their payment. It was called a "lease" but it was of perishable property and for ninety-nine years. Nor do we understand that the rule limits this effect to contracts induced by any particular species of consideration. The only question is whether it is a valid contract. It is so, as respects the consideration, if supported by any that is sufficient, as between the parties, of whatever kind.

The main defense, however, was that the agreement had been rescinded, in support of which a formal instrument, duly signed and purporting to rescind it, was introduced in evidence over objection by the plaintiff. It bears no date but the testimony shows it was executed in March, 1885. If appellant had notified them of his acceptance of it, they could not effectually rescind it, as against him, without his consent. Bishop on Contracts, Sec. 1223 and notes.

*3 But it is claimed that the provision in the agreement, last above quoted, is a reservation of the right and power to rescind, by which, as a substantive part of what he accepted, appellant also is bound.

It does not appear that he ever had actual notice of this provision. But if he is chargeable with such notice, we are inclined to regard it, not as a reservation to appellees of the power to rescind, but a provision for the benefit of Philip S. Brower alone, in case of breach or failure to perform on their part, for the reason that as the principal item of consideration to him was really an annuity for his life (under the name of rent), the property to be delivered, or the money value thereof, might be very considerably greater than the damages he could recover for any breach of the contract without this provision, since the value of the annuity would be constantly diminishing. Nor was it shown that they did deliver up to him all the property mentioned, or its value in money. Elwood Brower, one of the appellees, says their father took back what was then left of it, which did not include the hogs, and he could not say whether he had sold the sheep or not,

and Philip S. Brower swore that the property was never in his possession after the original contract was made.

Appellees further claim that if appellant did notify them of his acceptance of the agreement, he did not abide by it, the evidence of which consists alone in the fact that he afterward took a note from his debtor for the amount standing in account. We do not consider this a repudiation of his acceptance. In view of the length of time given by the agreement for their payment of the debt, he had the right, consistently with his acceptance, so to liquidate the account when due, and thus secure interest thereon if payment should be postponed.

It is not denied that he did notify appellees of his acceptance of their agreement to pay. He never consented to its rescission, and he gave them the full time prescribed for payment.

The court below refused to hold, as asked by appellant, that there could be no rescission to impair his right, after notice given of his acceptance, without his consent. It appears to us that the finding was controlled by the view of the law indicated by such refusal, which we think was error. The judgment will therefore be reversed and the cause remanded.

*Reversed and remanded.*

Ill.App. 3 Dist. 1886.
Hume v. Brower
25 Ill.App. 130, 1887 WL 5747 (Ill.App. 3 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

673 N.E.2d 1128

Page 1

285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707
**(Cite as: 285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707)**

▷

Pepper Const. Co. v. Transcontinental Ins. Co.
Ill.App. 1 Dist.,1996.

Appellate Court of Illinois,First District, Fourth Division.
PEPPER CONSTRUCTION COMPANY, Plaintiff and Counterdefendant-Appellee and Cross-Appellant,
v.
TRANSCONTINENTAL INSURANCE COMPANY, Defendant and Counterplaintiff-Appellant and Cross-Appellee (Edward R. Quinlan, Defendant and Counterdefendant; CNA Insurance Companies, and Climatemp, Inc., Defendants).
**No. 1-95-2973.**

Nov. 27, 1996.

General contractor filed declaratory judgment action, alleging that its subcontractor's contract with second subcontractor, providing that second subcontractor was bound by all documents to which subcontractor was bound, obligated second subcontractor to provide insurance to general contractor. The Circuit Court, Cook County, Lester Foreman, J., granted summary judgment for general contractor, and second subcontractor's insurer appealed. The Appellate Court, Cahill, J., held that: (1) fact issues regarding meaning of ambiguous contract between subcontractor and second subcontractor precluded summary judgment on issue of whether second subcontractor had to provide insurance coverage for general contractor, and (2) insurer was not estopped from denying coverage despite fact that insurer had assumed defense of general contractor for more than three years before tendering defense back to general contractor.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Contracts 95 ☞147(1)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(1) k. In General. Most Cited Cases
In construing contract, court must give effect to intent of the parties.

**[2] Contracts 95 ☞143(1)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k143 Application to Contracts in General
        95k143(1) k. In General. Most Cited Cases

**Contracts 95 ☞176(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k176 Questions for Jury
        95k176(2) k. Ambiguity in General. Most Cited Cases
When interpreting contract, court must first decide, as matter of law, whether language of contract is ambiguous.

**[3] Evidence 157 ☞448**

157 Evidence
  157XI Parol or Extrinsic Evidence Affecting Writings
    157XI(D) Construction or Application of Language of Written Instrument
      157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
If contract terms are ambiguous or capable of more than one interpretation, parol evidence is admissible to determine intent of the parties.

**[4] Contracts 95 ☞176(2)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

673 N.E.2d 1128                                                                                      Page 2
285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707
**(Cite as: 285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k176 Questions for Jury
        95k176(2) k. Ambiguity in General.
Most Cited Cases
Interpretation of ambiguous contract is question of
fact.

**[5] Judgment 228 &#9756;181(19)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(15) Particular Cases
        228k181(19) k. Contract Cases in Gen-
eral. Most Cited Cases

**Judgment 228 &#9756;181(23)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(15) Particular Cases
        228k181(23) k. Insurance Cases. Most
Cited Cases
Fact issues regarding meaning of ambiguous con-
tract, which provided that second subcontractor was
bound by documents to which first subcontractor
was bound, precluded summary judgment on issue
of whether second subcontractor had to provide in-
surance coverage for general contractor, pursuant to
terms of first subcontractor's separate contract with
general contractor, which required first subcontract-
or to provide insurance for general contractor.

**[6] Insurance 217 &#9756;3111(1)**

217 Insurance
  217XXVI Estoppel and Waiver of Insurer's De-
fenses
    217k3105 Claims Process and Settlement
      217k3111 Defense of Action Against In-
sured
        217k3111(1) k. In General. Most Cited
Cases

(Formerly 217k397.1)
Second subcontractor's insurer was not estopped
from denying coverage with respect to suit brought
against general contractor, even though insurer as-
sumed defense for more than three years before ten-
dering defense back to general contractor, where in-
surer was not attempting to assert defense under in-
surance policy, but was claiming that there was no
policy and that it was not the insurer for general
contractor.

**\*\*1129\*\*\*708\*574** John D. Kuhn of Fedota &
Rocca, Chicago, for Appellant.
Cassiday, Schade & Gloor, Chicago (Jennifer A.
Keller and Donald F. Ivansek, of counsel), for Ap-
pellee.
Justice CAHILL delivered the opinion of the court:
Transcontinental Insurance Company appeals a trial
court grant of summary judgment for Pepper Con-
struction Company in a declaratory judgment ac-
tion. Pepper cross-appeals the court's denial of at-
torney fees. We reverse and remand the grant of
summary judgment, finding a triable issue of fact.
We affirm the denial of attorney fees.

Pepper was the general contractor for a construction
project in Chicago. Pepper subcontracted with Ad-
vance Mechanical Systems. Advance agreed to per-
form heating, ventilation, and air conditioning work
for the project. The contract also required Advance
to provide insurance naming Pepper as an addition-
al insured.

Advance, in turn, subcontracted with Climatemp to
perform work at the site. The contract between Ad-
vance and Climatemp contained the following clause:

  "Work performed by [Climatemp] shall be in
  strict accordance with all applicable plans, gener-
  al conditions, specifications, and addenda thereto,
  and [Climatemp] is bound by all provisions of
  these documents and also all other documents to
  which [Advance] is bound, and to the same ex-
  tent."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

673 N.E.2d 1128
285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707
**(Cite as: 285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707)**

Page 3

**\*\*1130 \*\*\*709** Transcontinental was Climatemp's insurer. The policy contains an additional insured endorsement which reads in part:

"Owners, Lessees or Contractors.

Commercial General Liability Coverage Part.

1. Who is an insured (Section II) is amended to include as an insured any person or organization (called 'additional insured') for whom or for which you have contracted or agreed to provide general liability insurance, but only with respect to liability arising out of 'your work' for the additional insured(s)."

An employee of Climatemp was injured while working at the job site. He filed a personal injury lawsuit against Pepper. Pepper **\*575** tendered its defense to Climatemp's insurer, Transcontinental, on February 27, 1991, alleging that Pepper was an additional insured under Transcontinental's insurance policy covering Climatemp.

Transcontinental accepted Pepper's defense on March 28, 1991. Transcontinental tendered the defense back to Pepper over three years later, on April 26, 1994, alleging that it had never agreed to provide insurance for Pepper.

Pepper filed this declaratory judgment action, alleging that the language cited above in Climatemp's contract with Advance triggered the additional insured clause cited above in favor of Pepper.

Transcontinental filed a counterclaim, alleging that Pepper in its tender of defense fraudulently misrepresented that a contract existed between Pepper and Climatemp which induced Transcontinental to accept Pepper's tender.

The parties subsequently filed cross-motions for summary judgment. Pepper also asked for attorney fees under section 155 of the Illinois Insurance Code. 215 ILCS 5/155 (West 1992).

The trial court denied Transcontinental's motion

and granted summary judgment for Pepper, finding no ambiguity in the contract. The court stated: "I believe that under the relationship between Advance and Climatemp, Climatemp had an obligation to afford coverage to Pepper." The court then denied Pepper's request for attorney fees.

The parties agree on the issue: to include Pepper among the additional insureds in the Transcontinental policy, Climatemp's contract with Advance must be read to impose Advance's insurance commitments on Climatemp.

Transcontinental argues that Climatemp did not contract with Advance to provide insurance. Transcontinental contends that the clause in the contract between Advance and Climatemp upon which Pepper relies refers only to "work performed" requirements and has nothing to do with insurance obligations.

Pepper responds that its contract with Advance requires Advance to provide comprehensive general liability insurance naming Pepper as an additional insured. Pepper then cites the language in the contract between Advance and Climatemp, quoted above, and concludes that Climatemp was therefore required to provide insurance for the benefit of Pepper because "Climatemp expressly agreed to be bound by *all* documents to which Advance was bound and to the same extent as Advance." (Emphasis added.)

[1][2][3][4] In construing a contract, a court must give effect to the intent of the parties. *In re Doyle,* 144 Ill.2d 451, 468, 163 Ill.Dec. 515, 581 N.E.2d 669 (1991). A court must first decide, as a matter of law, whether the language **\*576** of the contract is ambiguous. *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 288, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990). If contract terms are ambiguous or capable of more than one interpretation, parol evidence is admissible to determine the intent of the parties. The interpretation of an ambiguous contract is a question of fact. *Quake Construction,* 141 Ill.2d at 288-89, 152 Ill.Dec. 308, 565 N.E.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

673 N.E.2d 1128
285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707
(Cite as: 285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707)

Page 4

990.

Summary judgment is only appropriate when the pleadings, depositions, admissions, or affidavits on file show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 1992); **1131***710 *LaSalle National Bank v. Skidmore, Owings & Merrill,* 262 Ill.App.3d 899, 902, 200 Ill.Dec. 225, 635 N.E.2d 564 (1994).

[5] We believe the contract language upon which Transcontinental relies is susceptible to more than one reasonable interpretation. It is reasonable to interpret the language-"all other documents to which Advance is bound"-to mean that the parties intended that Climatemp was bound to provide insurance for Pepper because Advance contracted to provide insurance for Pepper. But, it is also reasonable to infer that the quoted clause-"all other documents to which Advance is bound"-is modified by the language preceding it and confined only to work performance elements of the contract imposed on Climatemp. Read together, the "work performed" clause and "all other documents to which Advance is bound" create an ambiguity and a question of fact. See *Quake Construction,* 141 Ill.2d at 288-89, 152 Ill.Dec. 308, 565 N.E.2d 990. The issue was improperly resolved by the trial court on a motion for summary judgment. The intentions of the parties are subject to explanation by extrinsic evidence.

We note that during oral argument Pepper alleged that the Advance/Climatemp contract explicitly refers to "insurance requirements" in a separate section and paragraph from the "work performed" clause. This language was not quoted, nor did the parties address any other part of the Advance/Climatemp contract in the briefs. The copy of the contract in the record is illegible. The effect of other language in the contract which refers to insurance and might resolve the ambiguity would be speculation given the state of this record.

*577 Pepper argues that there is yet another ground

to affirm the trial court's decision. Because we review the grant of summary judgment *de novo* and may affirm the decision on any ground in the record, regardless of whether the trial court relied on that ground or whether the court's reasoning was correct, we address Pepper's argument. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill.2d 90, 102, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992).

[6] Pepper argues that Transcontinental is estopped from denying coverage because it assumed the defense for more than three years before it tendered the defense back to Pepper. Pepper relies on the decisions in *Gibraltar Insurance Co. v. Varkalis,* 46 Ill.2d 481, 263 N.E.2d 823 (1970) and *Textile Machinery v. Continental Insurance Co.,* 87 Ill.App.3d 154, 42 Ill.Dec. 506, 409 N.E.2d 1 (1980).

In *Gibraltar,* the supreme court held the insurer waived policy defenses for liability after it had taken over the insured's defense for more than 16 months. The court quoted the following language from *Apex Mutual Insurance Co. v. Christner,* 99 Ill.App.2d 153, 161, 240 N.E.2d 742 (1968): "It is well settled that assumption of the insured's defense constitutes a waiver by the insurer of all questions of policy coverage. [Citations.] If, therefore, in spite of doubts as to coverage, the insurer elects to take over the insured's defense, it will afterwards be estopped from denying its own liability under the policy." *Gibraltar,* 46 Ill.2d at 487, 263 N.E.2d 823.

The court in *Textile* held the insurer was estopped from denying policy coverage where it had defended its insured for two and a half years without a reservation of rights.

The courts in each of these cases held insurers were estopped from asserting defenses under policies against their insureds. Here, by contrast, Transcontinental is claiming that it is not an insurer and Pepper is not an insured. "The doctrines of waiver and estoppel presuppose that the party against whom the doctrines are asserted had a right, claim or priv-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

673 N.E.2d 1128
285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707
**(Cite as: 285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707)**

Page 5

ilege that it could relinquish." *Alliance Acceptance v. Yale Insurance Agency,* 271 Ill.App.3d 483, 493-94, 208 Ill.Dec. 49, 648 N.E.2d 971 (1995). We distinguish *Gibraltar* and *Textile* on the basis that Transcontinental is not attempting to assert a defense under a policy of insurance. It is claiming there is no policy. This issue, we have determined, must be decided by a trier of fact. We decline to apply the doctrines of estoppel or waiver to preclude Transcontinental from asserting that Climatemp did not contract to provide insurance for Pepper.

**1132 ***711 Finally, we address Pepper's argument on cross-appeal that the trial court abused its discretion in denying its request for attorney fees under section 155 of the Illinois Insurance Code. 215 ILCS 5/155 (West 1992). Pepper argues that Transcontinental's conduct in denying the existence of an insurance policy constitutes vexatious and unreasonable conduct. Based upon our decision that an issue of fact exists about whether Climatemp contracted to provide *578 insurance for Pepper, we find the trial court did not abuse its discretion in refusing Pepper attorney fees.

Affirmed in part and reversed in part and remanded.

HOFFMAN, P.J., and THEIS, J., concur.
Ill.App. 1 Dist.,1996.
Pepper Const. Co. v. Transcontinental Ins. Co.
285 Ill.App.3d 573, 673 N.E.2d 1128, 220 Ill.Dec. 707

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.